# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2533

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Nathaniel Jonathan Smith, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: February 16, 2011
Filed: July 14, 2011

_____

Before LOKEN, MELLOY, and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

Nathaniel Jonathan Smith conditionally pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), reserving the right to appeal the district court's[1] denial of his motion to suppress a handgun seized in a search of his car and his subsequent incriminating statements. Smith also argues that his 180-month sentence as an armed career criminal was improper because his 2000 Minnesota attempted burglary conviction was not a violent felony. See 18 U.S.C. § 924(e)(2)(B)(ii). We affirm.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable Jeffrey J. Keyes, United States Magistrate Judge for the District of Minnesota.

# I. The Suppression Issues

On December 2, 2008, Smith drove an acquaintance, Hannah Mae Oestreich, to a home in Crystal, Minnesota, to retrieve her belongings. A Crystal police officer accompanied them separately in a squad car because a Harassment Restraining Order (HRO) prohibited Oestreich from visiting the home unescorted. At the same time, Crystal Police Officer Kathleen Gomez drove separately to the home to arrest Oestreich for earlier HRO violations. After arriving, Officer Gomez saw Oestreich transfer items from a car in the home's driveway to Smith's car. Gomez arrested Oestreich, placed her in Gomez's squad car, and checked for outstanding warrants. Oestreich asked if she would be released if she provided information about "something serious in [Smith's] car." Gomez told Oestreich there was nothing she could say that would secure her release and proceeded to Smith's car, where he was still seated, to investigate his involvement and the property Oestreich put in his car. Smith cooperated, providing his identity and cell-phone number and answering questions regarding his minimal knowledge of Oestreich's domestic dispute.

Officer Gomez returned to her squad car to run a warrant check on Smith. From the back seat, Oestreich volunteered that there were drugs and a gun in Smith's car, providing their supposed location, and said Smith had been in trouble for drugs in the past. Officer Gomez decided to return to Smith's car to talk with him further. Smith admitted he was on parole for a drug offense. He denied Oestreich's accusation, stepped out of the car, and consented to a search of his person, which revealed nothing. But when Officer Gomez asked for consent to search the car, Smith became agitated and refused. Gomez testified at the suppression hearing that she handcuffed Smith and placed him in the back of another squad car because "he was upset about us searching his car" and "I thought he might start fighting with us."

Officer Gomez placed a call to a nearby police department and requested a drug-sniffing dog, which arrived within ten minutes. The dog alerted on the car,

indicating the presence of drugs. While the dog's handler searched the car for drugs, Officer Gomez talked further with Oestreich, who again insisted there was a gun located on the back side of the car's back seat. Gomez returned to the car's passenger compartment, reached behind the back seat, and seized a loaded nine-millimeter handgun. She placed Smith under arrest, and he was taken to the Crystal Police Department, where he made incriminating statements after receiving Miranda warnings. The total time from Officer Gomez's arrival on the scene until Smith's arrest was approximately thirty minutes.

On appeal, Smith argues that Officer Gomez violated his Fourth Amendment rights because Gomez (1) had no valid reason to detain him after arresting Oestreich for HRO violations; (2) unreasonably prolonged the detention when Oestreich said there were drugs and a gun in Smith's car; and (3) arrested Smith without probable cause when he was handcuffed and placed in a squad car.

(1) The record does not support Smith's contention that he was detained the moment Oestreich was arrested. Smith remained in his car while Gomez placed Oestreich in a squad car and did a warrants check. Wanting to ascertain Smith's connection to the HRO violations and the property Oestreich put in his car, Officer Gomez returned to his car, where Smith answered non-accusatory questions cooperatively. This encounter is properly viewed as consensual, requiring no Fourth Amendment scrutiny. See Florida v. Bostick, 501 U.S. 429, 434 (1991).

(2) A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000), citing Terry v. Ohio, 392 U.S. 1, 30 (1968). We agree with the district court that Officer Gomez acquired reasonable, articulable suspicion when Oestreich, "a known but unproven informant," insisted there were drugs and a gun in Smith's car, and her tip was partially verified by Smith admitting to Gomez that he was "on parole for drugs."

Reasonable, articulable suspicion "is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences." United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010), cert. denied, 131 S. Ct. 1032 (2011), citing United States v. Arvizu, 534 U.S. 266, 273-74 (2002); see Alabama v. White, 496 U.S. 325, 330-32 (1990).

Having acquired reasonable, articulable suspicion, the Fourth Amendment permitted Officer Gomez to "diligently pursue[] a means of investigation that was likely to confirm or dispel [her] suspicions quickly, during which time it was necessary to detain [Smith]." United States v. Sharpe, 470 U.S. 675, 686 (1985); see also United States v. Montano-Gudino, 309 F.3d 501, 504 (8th Cir. 2002). To this end, Gomez reasonably asked Smith for consent to search his person, which he granted, and his car, which he refused. Gomez's reasonable, articulable suspicion there were drugs and a gun in the car was now heightened, giving her reasonable grounds to briefly extend Smith's detention for a dog sniff of the car's exterior. See United States v. Lyons, 486 F.3d 367, 372 (8th Cir. 2007), citing Illinois v. Caballes, 543 U.S. 405, 407-08 (2005); United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002); see also United States v. Yang, 345 F.3d 650, 656 (8th Cir. 2003), cert. denied, 541 U.S. 952 (2004).[2]

(3) At this point, Smith, who was standing just outside his car, became agitated to the extent that Officer Gomez feared he might begin fighting with Gomez and her female partner. We have repeatedly held that police officers may reasonably handcuff a suspect and place him in a squad car during the course of a Terry stop in order to protect their safety and maintain the status quo. See, e.g., United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006), cert. denied, 549 U.S. 1272 (2007); United States

---

[2]An exterior dog sniff is not a Fourth Amendment search of the car's interior, to which Smith would not consent. United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999), cert. denied, 528 U.S. 1161 (2000)

v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004); United States v. Davis, 202 F.3d 1060, 1063 (8th Cir.), cert. denied, 531 U.S. 883 (2000); United States v. Navarrete-Barron, 192 F.3d 786, 791 (8th Cir. 1999)   After securing a suspect, officers may also conduct a protective sweep of the vehicle's passenger compartment to search for dangerous weapons that the suspect or other occupants might later access. See Michigan v. Long, 463 U.S. 1032, 1045-52 (1983); United States v. Plummer, 409 F.3d 906, 909 (8th Cir. 2005), cert. denied, 546 U.S. 1177 (2006).[3] In reviewing the reasonableness of these actions, the issue is whether the officer had an objectively reasonable concern for officer safety or suspicion of danger. Long, 463 U.S. at 1050; United States v. Goodwin-Bey, 584 F.3d 1117, 1120 (8th Cir. 2009), cert. denied, 130 S. Ct. 1563 (2010).

In this case, we agree with the district court that Officer Gomez had an objectively reasonable concern for officer safety that justified both handcuffing Smith and placing him in a squad car while awaiting arrival of the drug-sniffing dog, and searching the area of the passenger compartment where Oestreich said a gun would be found. At no time during the twenty minutes before the dog alerted and the gun was seized did Smith's brief detention become a formal or *de facto* arrest. Compare Lyons, 486 F.3d at 372; United States v. Donnelly, 475 F.3d 946, 953-54 (8th Cir.), cert. denied, 551 U.S. 1123 (2007). Reviewing the district court's fact determinations for clear error and its legal conclusions *de novo,* we affirm the denial of Smith's motion to suppress.[4]

---

[3]This rule was not affected by the Supreme Court's recent decision in Arizona v. Gant, which applies only to searches incident to the arrest of a vehicle's occupant. 129 S. Ct. 1710, 1724 (2009) (Scalia, J., concurring).

[4]Smith's argument that the government failed to establish the drug dog's reliability to justify the dog handler's search of the car's interior is without merit. It was Gomez's independent search for the gun that was the subject of the motion to suppress. Moreover, the government need not present evidence of a dog's training and reliability if the issue has not been raised by the defendant. Compare United

## II. The Armed Career Criminal Act Issue

The Armed Career Criminal Act provides that a person who is guilty of being a felon in possession of a firearm and who has three previous convictions "for a violent felony or a serious drug offense" shall be "imprisoned not less than fifteen years." 18 U.S.C. § 924(e)(1). Smith has two prior convictions for serious drug offenses, but he denies that he has a third predicate conviction, arguing that his 2000 Minnesota conviction for third-degree attempted burglary was not a violent felony.

As relevant here, violent felony is defined as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Attempted burglary is not an enumerated offense, so the question is whether it is a violent felony under the residual "otherwise involves" clause. James v. United States, 550 U.S. 192, 203 (2007). When considering whether an intentional crime such as attempted burglary falls within the residual clause, "levels of risk divide crimes that qualify from those that do not." Sykes v. United States, 131 S. Ct. ____, No. 09-11311, slip op. at 10 (June 9, 2011). The residual clause applies "when the relevant prior offenses involved a potential risk of physical injury similar to that presented by burglary, extortion, arson, and crimes involving use of explosives." Id. at 13.

Some years ago, we held that the Minnesota crime of second-degree attempted burglary is a violent felony under the residual clause. United States v. Solomon, 998 F.2d 587, 590 (8th Cir.), cert. denied, 510 U.S. 1026 (1993).[5] But the Supreme

---

States v. Winters, 600 F.3d 963, 966-67 (8th Cir.), cert. denied, 131 S. Ct. 255 (2010).

[5]The same analysis applies to the Minnesota crime of third-degree attempted burglary because both second- and third-degree burglary include the elements of generic burglary as defined in Taylor v. United States, 495 U.S. 575, 598 (1990). See

Court's residual clause jurisprudence has changed often in recent years. See Sykes, slip op. at 1-6 (Scalia, J., dissenting). Therefore, we must seriously consider Smith's contention that Solomon has been implicitly overruled by recent Supreme Court decisions. Obviously, the most relevant decision is James, which held that a Florida conviction for attempted burglary qualified as a violent felony under the residual clause. 550 U.S. at 195.

Though the Florida statute at issue in James was more broadly worded, the Court noted that the Florida Supreme Court had narrowed its application by requiring an "overt act directed toward entering or remaining in a structure or conveyance" and by holding that "mere preparation" is insufficient. James, 550 U.S. at 202, quoting Jones v. State, 608 So. 2d 797, 799 (Fla. 1992). The Court concluded in James that the Florida offense, as so narrowed, fell within the residual clause because "the risk [of physical injury to another] arises not from the completion of the burglary, but from the possibility that an innocent person might appear while the crime is in progress. Attempted burglary poses the same kind of risk." 550 U.S. at 203.

We consider here the Minnesota crime of attempted burglary. The Minnesota Criminal Code defines attempt offenses: "Whoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime." Minn. Stat. § 609.17, subd. 1. The statute's 1963 Advisory Committee Comment stated:

> The overt acts need not be such that, if not interrupted, they must result in the commission of the crime. They must, however, be something more than mere preparation, remote from the time and place of the intended crime; but if they are not thus remote, and are done with the

---

Minn. Stat. §§ 609.582, subd. 2 and 3; United States v. Sonczalla, 561 F.3d 842, 846 (8th Cir.), cert. denied, 130 S. Ct. 238 (2009).

> specific intent to commit the crime, and directly tend in some substantial degree to accomplish it, they are sufficient to warrant a conviction.

Minn. Stat. § 609.17, cmt. subd.1, citing <u>State v. Dumas</u>, 136 N.W. 311, 314 (1912). Construing this definition of attempt in the context of second-degree burglary, we concluded in <u>Solomon</u> "that under Minnesota law only conduct that carries a serious potential risk of physical injury to another may result in a conviction for attempted second degree burglary." 998 F.2d at 590. It is significant that, in <u>James</u>, the Supreme Court noted that "every Court of Appeals that has construed an attempted burglary law *similar in scope to Florida's* has held that the offense qualifies as a 'violent felony' under clause (ii)'s residual provision," and cited <u>Solomon</u> as one of those decisions. 550 U.S. at 204-05 & n.3 (emphasis added).

Smith nonetheless argues that the Minnesota crime of attempted third-degree burglary is not a violent felony under <u>James</u> because "an act which is a substantial step toward, and more than preparation for," the crime of burglary "need not be the act of entering" a building and "can be remote in time from the actual event." In such cases, he argues, the crime does not present a serious potential risk of physical injury to another.

The few reported Minnesota decisions involving attempted burglary offenses do not support this speculative interpretation of the statute. In <u>Dumas</u>, the 1912 decision cited by the Advisory Committee, the Supreme Court of Minnesota concluded that an indictment alleging that the defendant entered a building for the purpose of burning it was sufficient to constitute attempted arson in the third degree. 136 N.W. at 314. More recently, the Court of Appeals of Minnesota has twice stated that the crime of attempted burglary requires proof that the defendant *entered or attempted to enter a building*. <u>State v. Bodin</u>, 2010 WL 273359, at *2 (Minn. App.

Jan. 26, 2010); State v. Ring, 554 N.W.2d 758, 760 (Minn. App. 1996).[6] We have found no reported decision, and Smith presents no other evidence, that prosecutors in Minnesota ever charge attempted burglary in a situation where the conduct did not include a "substantial step" creating the same kind of risk present in completed burglaries. In these circumstances, we conclude that the elements of the Minnesota crime of attempted burglary, like the Kansas attempted burglary offense at issue in United States v. Forrest, 611 F.3d 908, 911-12 (8th Cir.), cert. denied, 131 S. Ct. 622 (2010), involve a level of risk that is indistinguishable from the "overt act directed toward entering" described in James. We therefore reaffirm our prior decision in Solomon.

The judgment of the district court is affirmed.

_____

___

[6]Consistent with these decisions, Smith's Presentence Investigation Report, to which he did not object, recited that his attempted burglary offense involved crawling under a fence that surrounded a lumber company building.