# United States Court of Appeals
### For the Eighth Circuit

_____

No. 22-3006
_____

United States of America

*Plaintiff - Appellee*

v.

Daniel Bonilla

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: April 13, 2023
Filed: November 20, 2023
_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

Daniel Bonilla conditionally pleaded guilty to possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). The district

court[1] sentenced Bonilla to a 132-month term of imprisonment and 5 years of supervised release. Bonilla appeals the denial of his motion to suppress. We affirm.

I.

On the morning of December 16, 2020, several law enforcement officers from the Missouri Sheriff's Office and the Missouri Police Department's Drug Interdiction Unit were working interdiction at the Greyhound Bus Station in Kansas City, Missouri. Dressed in plain clothes without visible badges or weapons, they waited for the bus originating from Los Angeles, California—a bus route that had previously resulted in narcotics recoveries and related arrests. When the bus arrived at 8:00 a.m., Detective Antonio Garcia had his K-9 Zeus sniff the bus's luggage compartments, and Zeus alerted on a silver suitcase.

Several minutes later, the silver suitcase was brought to the station lobby for passenger pick-up, and the detectives saw Bonilla retrieve it. Detective Collin Love approached Bonilla, identified himself as a police officer, and explained that a drug dog had alerted on his suitcase. He asked whether Bonilla was carrying any narcotics or large sums of money, and Bonilla denied carrying either. Love then asked to search the suitcase, and Bonilla said "Yeah. Search it."

For safety reasons, Detective David Middleton approached Bonilla while Love, who now had his back to Bonilla, searched the suitcase. Middleton told Bonilla that he was also a police officer, and he asked Bonilla for identification and his bus ticket. After Bonilla provided his documents, Middleton noticed that Bonilla's hands were shaking and that he could not seem to keep still. Middleton tried to engage in conversation to get him to calm down, but Bonilla had difficulty answering simple questions, and would not make eye contact. Bonilla also asked

---

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri, adopting the report and recommendation of the Honorable Lajuana M. Counts, United States Magistrate Judge for the Western District of Missouri.

Middleton—twice—if he could visit the bus station restroom to brush his teeth. Middleton testified that he thought this request was "random[]" and he sensed it was an excuse to get away and discard something or to "leave police presence." He told Bonilla that he preferred him to stay and watch while his suitcase was searched, to avoid theft accusations later. Bonilla did not leave, but he remained visibly nervous and looked around, as if seeking "an avenue of escape."

Meanwhile, Love finished searching Bonilla's suitcase. He found no narcotics or contraband. Love then reapproached Bonilla and asked him for consent to search his backpack. At that point, according to Love, "there was a dramatic shift" in Bonilla's demeanor. Bonilla started shifting his weight from left to right, playing with the zipper on his jacket, and placing his hands in and out of his pockets. In contrast to when Love asked him about the suitcase, Bonilla became very nervous when asked about the backpack. Initially, he was evasive. He responded that the officers had already searched his suitcase, and "his speech became stuttered." Eventually he refused consent. Bonilla's reaction to questions about the backpack, which appeared new, made the officers increasingly suspicious. Love believed that "when someone [consents] . . . to search one bag but not another, it usually means there is some type of contraband in the other bag that the person does not want [officers] to find." Based on his experience, he also knew that new bags were often purchased to transport narcotics, and that people sometimes transfer drugs from one of their bags to another.

When Middleton told Bonilla that a drug dog was going to sniff his backpack, Bonilla's "stuttering became thicker," and he continued shaking and looking around. At that point, Middleton believed "that Bonilla was getting ready to either fight or run," so he placed Bonilla in handcuffs. Love took Bonilla's backpack and a minute later, Zeus alerted to the odor of narcotics on the backpack.

Bonilla was then taken to an office at the Greyhound Bus Station with his suitcase and backpack. After officers requested and received a warrant to search his

backpack for narcotics, they discovered three one-kilogram packages inside the backpack that tested positive for fentanyl.

Bonilla was charged in a one-count indictment with possession with intent to distribute fentanyl. He moved to suppress the evidence seized. Following an evidentiary hearing, the magistrate judge recommended that the motion be denied. Bonilla objected, but the district court adopted the recommendation in full and denied the motion. Bonilla entered a conditional guilty plea. He now appeals, arguing only that because he was arrested without probable cause when officers placed him in handcuffs during an investigative stop, the evidence seized from his backpack must be suppressed as the fruit of his unlawful arrest.

## II.

We review "the district court's findings of fact under the clearly erroneous standard, and the ultimate conclusion of whether the Fourth Amendment was violated is subject to *de novo* review." United States v. Williams, 777 F.3d 1013, 1015 (8th Cir. 2015) (quoting United States v. Stephenson, 924 F.2d 753, 758 (8th Cir. 1991)). "The district court's denial of a motion to suppress will be upheld unless it is not supported by substantial evidence, is based on an erroneous interpretation of applicable law, or is clearly mistaken in light of the entire record." United States v. Quinn, 812 F.3d 694, 697 (8th Cir. 2016) (citing United States v. Hastings, 685 F.3d 724, 727 (8th Cir. 2012)).

A law enforcement officer may conduct a brief investigatory Terry stop when they have "reasonable and articulable suspicion that criminal activity is afoot." United States v. Lemons, 84 F.4th 766, 769 (8th Cir. 2023) (citing Haynes v. Minnehan, 14 F.4th 830, 835 (8th Cir. 2021)). Bonilla does not challenge the officers' reasonable suspicion for the Terry stop. Instead, Bonilla argues that the investigative stop in this case became an arrest when Middleton placed him in handcuffs. See United States v. Halverson-Weese, 30 F.4th 760, 765–66 (8th Cir. 2022) ("A de facto arrest occurs when the officer's conduct is more intrusive than

-4-

necessary for a <u>Terry</u> investigative stop." (quoting <u>United States v. Sanford</u>, 813 F.3d 708, 712–13 (8th Cir. 2016))). And he asserts that because the officers lacked probable cause to arrest him, any evidence seized from his backpack after the unlawful arrest must be suppressed. According to Bonilla, but-for the unlawful arrest, he would have left the bus station and taken the backpack with him, and the fentanyl would not have been discovered.

Officers may use handcuffs during a <u>Terry</u> stop if they have "some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." <u>El-Ghazzawy v. Berthiaume</u>, 636 F.3d 452, 457 (8th Cir. 2011) (quoting <u>Bennett v. City of Eastpointe</u>, 410 F.3d 810, 836 (6th Cir. 2005)); <u>see also</u> <u>United States v. Smith</u>, 645 F.3d 998, 1002 (8th Cir. 2011) ("We have repeatedly held that police officers may reasonably handcuff a suspect . . . during the course of a <u>Terry</u> stop in order to protect their safety and maintain the status quo." (citations omitted)). There was no indication that Bonilla was armed, so the question is whether the officers had a legitimate purpose for handcuffing Bonilla under the circumstances they faced.

Here, the officers had a legitimate concern that Bonilla might try to run from the scene. When Detective Love asked for permission to search his suitcase, Bonilla was calm and cooperative, giving the impression that it was "not a big deal." However, as an additional officer started asking him questions, he showed physical signs of nervousness. Bonilla already knew that Zeus had alerted to his suitcase. Then, as Love was searching the suitcase, Bonilla asked to go brush his teeth, which would have allowed him to leave the scene with his backpack, out of the officers' sight. Middleton was immediately struck by the oddity of the request, thinking it seemed like an attempt to escape or to throw something away. Given the change in Bonilla's demeanor over a short period of time, the perceived attempt to discard contraband outside the presence of the officers, and the other factors that aligned at least in part with drug-trafficking behavior, the officers had a legitimate concern that Bonilla might try to flee.

Bonilla counters, saying that any reasonable person would be nervous under the circumstances he faced at the bus station. We have recognized as much, noting that it is not uncommon for civilians to become nervous when they are confronted by law enforcement officials. See United States v. Jones, 269 F.3d 919, 928–29 (8th Cir. 2001). But Love observed that "Bonilla exhibited more nervous behaviors" as the investigation continued, indicating that something more unusual was afoot. See id.; United States v. Riley, 684 F.3d 758, 763–64 (8th Cir. 2012) (accounting for "undue nervousness" in reasonable suspicion analysis). Love also described Bonilla's "dramatic shift" in demeanor, and Middleton saw signs that Bonilla was looking for a way "to leave police presence." As indications of Bonilla's nervousness escalated, so did the officers' suspicions, as well as their concerns that Bonilla may take sudden action to flee or otherwise put officers' safety at risk. On this record, it was not error to find that the use of handcuffs on Bonilla was necessary for a legitimate purpose and that, as a result, there was no de facto arrest.

### III.

Because placing Bonilla in handcuffs did not convert the investigative stop into a de facto arrest, it follows that the seizure of the evidence from his backpack was not the fruit of an unlawful arrest. We affirm the denial of the motion to suppress.

_____