# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-2431

_____

Leroy Duffie

*Plaintiff - Appellant*

v.

City of Lincoln, A Municipal Corporation; Nathan Kaiser; Tobias Hite; Shane Jensen

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: April 13, 2016
Filed: August 23, 2016

_____

Before SMITH, SHEPHERD, and KELLY, Circuit Judges.

_____

SMITH, Circuit Judge.

Officers Nathan Kaiser, Shane Jensen, and Tobias Hite of the City of Lincoln Police Department (LPD) conducted a high-risk traffic stop of Leroy Duffie. Duffie sued the City of Lincoln and the three police officers involved in the traffic stop (collectively "defendants") pursuant to 42 U.S.C. § 1983 for depriving him of his constitutional rights. Duffie argues that the defendants (1) conducted a high-risk traffic stop without reasonable suspicion, (2) used excessive force in conducting the

stop, (3) searched his van without consent, and (4) placed him in danger of physical harm without due process. The defendants claimed qualified immunity and moved for summary judgment on all claims. The district court granted the defendants' motion. We reverse and remand for further proceedings.

## I. *Background*

Around 9:20 p.m. on the evening of September 2, 2011, two clerks working at a northeast Lincoln, Nebraska convenience store called LPD and reported an encounter with a young man. The LPD's incident report noted that the young man—described by the clerks as black, in his late teens or early twenties with short black hair, and wearing a black shirt and blue jeans—acted strangely while making a purchase. He did not respond to one of the clerk's general questions, and the other clerk noted that the young man "kept starring [sic] at the cash register." After the young man left the store, one of the clerks took the garbage outside and noticed the same young man sitting in the passenger seat of an "early 90s Astro style van" described by the clerk as "maroon with white stripes down the side." As the clerk was returning to the store, the young man "held up a hand gun and acted like he was blowing smoke from the barrel." The clerk thought that the handgun resembled a silver Beretta. The report classified the young man as a "35222 - SUSPICIOUS PERSON." The report also indicates that the young man was accompanied by another young man sitting in the driver's seat of the van. The clerk described him as black, in his late teens or early twenties with braids or short hair, and wearing a white tank top. The report did not include a license plate.

When the 11:00 p.m. shift began, LPD briefed its officers entering duty of the incident. Around 12:45 a.m. on September 3, Officer Kaiser observed "an older maroon Chevrolet Astro Van (NE Plate #SNM794) with light colored stripes down the side" traveling on the roadway just ahead of his cruiser. The van had a handicapped parking placard hanging from the rearview mirror, but there is no indication that Officer Kaiser noticed it. Officer Kaiser believed that the van he

observed could be the van from the incident report. He attempted to view the occupants, but his visibility was limited due to the low light, his positioning, and the brevity[1] of his side-by-side travel with the van. Officer Kaiser could only confirm that the driver of the van was a black male. He thought that the driver was wearing a white top and "possibly" had braided hair. He was uncertain whether others occupied the van. Officer Kaiser radioed a sergeant and refreshed his memory of the incident-report details. Based on the match of the driver's race and gender and the similarity of the van description, Officer Kaiser determined that he "had probable cause to stop the van and investigate further."

Concerned that an occupant of the van may have a firearm, Officer Kaiser requested an additional officer to assist him in making a high-risk traffic stop. Officer Kaiser and Officer Jensen initiated the high-risk traffic stop, positioning their cruisers behind the van.[2] The officers exited their vehicles with their sidearms drawn and remained shielded behind their opened doors. Officer Kaiser ordered the driver "to turn off the vehicle, place his hands in the air, open the door, and slowly step out of vehicle." The driver did not immediately comply. The officers began cautiously approaching the vehicle with their sidearms drawn toward the van, while continuing to shout commands for the driver to exit the vehicle. The driver explained his apparent noncompliance. He attempted to inform the officers that he was physically unable to exit his vehicle with his hands in the air. The officers responded by ordering him to put his head back in the vehicle and get out with his hands in the air. Eventually, the driver opened his door and turned his body to exit the vehicle but immediately fell face-first to the pavement.

---

[1]Officer Kaiser estimated that he was able to look at the driver for no more than two to three seconds.

[2]At some point during the stop, Officer Hite also arrived to assist with the high-risk stop.

The driver, later identified as Duffie, is a double amputee with two prosthetic legs. He could not safely exit the vehicle in the manner that the officers commanded. The fall caused one of Duffie's prostheses to become detached. Duffie's prosthetic legs were ill-fitting due to weight loss from cancer treatments. Duffie remained on the ground for the remainder of the traffic stop. After finding no one else in the van, the officers handcuffed Duffie, still face down on the pavement, searched him for a weapon, and then removed the handcuffs after five to ten minutes at Duffie's request. The officers told Duffie that they stopped him because his vehicle matched the description of the van from the incident at the convenience store. By this point, the officers knew that Duffie did not match the description of the young man at the convenience store. Duffie was not a young man in a tank top with braids; at the time, he was a bald, 58 year-old double-amputee.

The officers resumed searching Duffie's van. Duffie claims that the officers began this second search without his consent and that he later consented only because he believed that the officers had already searched his van. In searching Duffie's van, the officers found a silver handgun-style paintball gun with a black grip. Duffie explained that the paintball gun belonged to his son. Officer Kaiser seized the paintball gun in order to follow-up with Duffie's son regarding the convenience-store incident. The officers then released Duffie. Although Duffie did not report any injuries to the officers during the traffic stop, he later claimed that he lost two teeth and tore his rotator cuff as a result of the traffic stop.

The defendants moved for summary judgment on the basis of qualified immunity. In ruling on the defendants' motion, the district court noted that Duffie's complaint failed to adequately allege which officers were responsible for the claimed constitutional violations. Thus, Duffie's complaint did not state a claim under § 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has

violated the Constitution."). Notwithstanding, the district court recognized that it had a duty to address the defendants' assertion of qualified immunity. It granted the defendants' motion for summary judgment based on qualified immunity.[3]

## II. *Discussion*

Duffie alleges that the defendants deprived him of his rights under the Fourth and Fourteenth Amendments. He argues that the defendants deprived him of his constitutional rights by (1) conducting a high-risk traffic stop without reasonable suspicion, (2) using excessive force in conducting the stop, (3) searching his van without consent, and (4) placing him in danger of physical harm without due process.[4] "We review *de novo* the district court's grant of summary judgment based on qualified immunity." *LaCross v. City of Duluth*, 713 F.3d 1155, 1157 (8th Cir. 2013) (citation omitted).

Although § 1983 makes no mention of qualified immunity, the common law roots of the doctrine are deep and were not discarded by § 1983's enactment. *See Pierson v. Ray*, 386 U.S. 547, 555 (1967); *see also* 4 William Blackstone, Commentaries *292. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

[3]The district court's order granted the defendants' motion for summary judgment "because these defendants are entitled to qualified immunity as to  [Duffie's] 42 U.S.C. § 1983 claims." Although the district court noted that Duffie's complaint failed to "establish which defendant officers were personally involved in which alleged constitutional violations," it did not grant the defendants' summary judgment motion on that basis. Accordingly, our review is limited to qualified immunity.

[4]Duffie also challenges LPD's policy on high-risk traffic stops as facially unconstitutional. Duffie did not raise this argument before the district court. Accordingly, we will not consider it on appeal. *See Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1014 (8th Cir. 2006) (declining to reverse a grant of summary judgment based upon an argument not raised below).

would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* A state official will be shielded by qualified immunity if (1) the plaintiff fails to allege or show that the official's conduct violated a constitutional right or (2) the constitutional right was not "'clearly established' at the time of [the official's] alleged misconduct." *Id.* at 232 (citations omitted). We have discretion to address either of these inquiries first. *Id.* at 236.

Duffie sufficiently alleges a violation of his Fourth Amendment rights. He argues that the LPD officers did not have reasonable suspicion to stop him because they did not have reasonable suspicion to stop the young man from the convenience-store incident. The defendants insist that Duffie has waived this argument by not raising it below. Even if not waived, the defendants note that Duffie conceded that "the display of a handgun raises concerns about criminal conduct" and that he did not dispute that it was "important . . . for LPD to respond" to the reported incident. The defendants agree with the district court that Officer Kaiser had reasonable suspicion to stop Duffie.

Before turning to the merits of Duffie's claim, we first consider whether he has waived the argument. Generally, we do not consider arguments raised for the first time on appeal. *See Mattson*, 462 F.3d at 1014. Accordingly, "a party cannot assert arguments that were not presented to the district court in opposing summary judgment in an appeal contesting an adverse grant of summary judgment." *Cole v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 533 F.3d 932, 936 (8th Cir. 2008) (citations omitted).

It is undisputed that Duffie has always contested the lawfulness of the high-risk traffic stop. Duffie's brief in opposition to the defendants' summary-judgment motion

argued that a genuine issue of material fact existed precluding summary judgment over "whether the information contained in the report required these Officers to engage in a high-risk traffic stop." The defendants argue that this is a different argument than the one that Duffie presents now. If Duffie's argument below is construed very narrowly, it could be read to contest only the *manner* of the traffic stop rather than the *fact* of the traffic stop. We decline to construe Duffie's argument so narrowly.

We consider Duffie's argument in light of the full record below: Duffie's complaint, the defendants' briefs in support of their motion for summary judgment, Duffie's brief in opposition to the motion for summary judgment, and the district court's order on the motion for summary judgment. In Duffie's complaint, he alleges that "the Officers seized Duffie without probable cause or reasonable suspicion." The defendants' brief supporting their motion for summary judgment argues that "the Officers had probable cause and reasonable suspicion to execute the traffic stop," and therefore, "[Duffie's] claims for unlawful seizure in violation of his Fourth Amendment rights cannot succeed." The defendants' reply brief lays out that "[Duffie] questions several parts of the traffic stop that will be addressed by Defendants in turn, namely: (1) the stop of the van, (2) the detention of [Duffie] by the Officers, and (3) the search of the Van." The defendants go on to argue that "[a]ny seizure or detention of [Duffie] . . . was based on probable cause and reasonable suspicion based on the gun incident report earlier that evening by an individual in a matching van." As already mentioned, Duffie's brief in opposition to the summary-judgment motion disputed "whether the information contained in the report required [the] Officers to engage in a high-risk traffic stop." Finally, the district court concluded that "the officers reasonably 'seized' Duffie and his vehicle." This record supports construing Duffie's argument to include the argument that he now makes and renders the defendants's waiver argument unpersuasive. *See Hormel v. Helvering*, 312 U.S. 552, 556–57 (1941) (listing the parties' opportunity to offer evidence on relevant issues and

notice of issues to the parties as reasons for an appellate court not to consider issues raised for the first time on appeal).

We now address whether the officers violated Duffie's clearly established constitutional right when they initiated the high-risk traffic stop. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. An officer may initiate an investigatory stop of a vehicle if there is "reasonable suspicion that criminal activity is afoot." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). When evaluating the validity of a traffic stop, we consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18 (citations omitted). Under *Terry*, probable cause is not required. *See United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007).

Officer Kaiser relied on an incident report that did not contain information sufficient to create reasonable suspicion that Duffie had already, was, or was about to commit a crime. *See United States v. Hensley*, 469 U.S. 221, 227 (1985) (extending *Terry* to the investigation of completed crimes). Nebraska law permits individuals who are at least 18 years old to open carry handguns in public. *See* Neb. Rev. Stat. §§ 28-1202, 28-1204 (2009). The City of Lincoln does not restrict an individual's right to open carry except in certain locations. *See* Lincoln, Neb., Mun. Ordinances § 9.36.130. Moreover, the mere report of a person with a handgun is insufficient to create reasonable suspicion.[5] *See Florida v. J.L.*, 529 U.S. 266, 272 (2000)

---

[5]The defendants do not attempt to explain what crime the young man was suspected of committing. Instead, they argue that Officer Kaiser had reasonable suspicion based on the incident report because a handgun was displayed and the "clerks were concerned enough to report the incident to LPD." The officers' written

(concluding that "an automatic firearm exception to our established reliability analysis would rove too far"). An objectively reasonable officer could not reliably conclude that the young man described in the report could not legally possess a firearm. Nothing in the report indicates that the clerk had special knowledge of the young man's age. The information contained in the incident report simply lacked the requisite indicia of reliability necessary to justify an officer in reasonably suspecting the young man to have been engaged in criminal activity. *See Adams v. Williams*, 407 U.S. 143, 147 (1972) (discussing information officers receive from informants and explaining that information "completely lacking in indicia of reliability" does not justify a forcible stop of a suspect); *see also J.L.*, 529 U.S. at 273 (holding that bare-boned tips do not satisfy the Fourth Amendment and a tip's indicia of reliability is critical in justifying a forcible stop of a suspect).

The incident report also did not adequately make out a case that the young man committed assault. *See* Neb. Rev. Stat. § 28-310 (2016) (defining third degree assault as "[t]hreaten[ing] another in a menacing manner"). The young man did not display hostile or menacing conduct toward the clerks in the store. The clerks thought that the young man acted strangely, but they did not describe anything threatening. The clerk who saw the young man with the gun acting as though he was blowing smoke from the barrel did not assert that the action was directed at him. The incident report reflects that the clerk was returning to the store when he saw the young man hold up the handgun. The clerk did not report that the young man looked at him, pointed the gun at him, or in any other way threatened him. The officers' reports reflect that they were responding to the display of a weapon, not a threat against the clerk.

Whatever suspicion Officer Kaiser possessed decreased when placed in the context of his stop of Duffie. After spotting the van, Officer Kaiser made an effort to see the driver, ostensibly to compare the driver with the persons associated with the

---

reports all describe the conduct of the young man as displaying a weapon.

convenience-store incident. Darkness limited Officer Kaiser's vision; nonetheless, an objectively reasonable police officer would not mistake a 58-year-old bald man for a young adult with hair. Officers may not turn a blind eye to facts that undermine reasonable suspicion. *See Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999). Finally, Duffie's acknowledgment of the importance of responding to the reported display of a handgun does not amount to a concession that a forcible stop was warranted. *Cf. Adams*, 407 U.S. at 147 (observing that unreliable information may "warrant no police response or require further investigation before a forcible stop of a suspect would be authorized"). The defendants admit that Duffie violated no traffic laws and that the incident report was Officer Kaiser's sole justification for the stop. The incident report did not contain information sufficient to create reasonable suspicion of criminal activity. At the time of Duffie's stop, the law clearly established that a traffic stop must be supported by reasonable suspicion. *See Delaware v. Prouse*, 440 U.S. 648, 654 (1979). Moreover, the contours of Duffie's right to be free from a governmental seizure absent reasonable suspicion were sufficiently clear. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The district court erred in holding that the incident report from several hours earlier justified Officer Kaiser's seizure of Duffie. On this record, Officer Kaiser is not entitled to qualified immunity. The written reports of Officers Jensen and Hite establish that they did not reasonably rely on any information from Officer Kaiser or dispatch. *See Hensley*, 469 U.S. at 232 (noting that officers who rely on constitutionally deficient information may have a good-faith defense to any civil suit). Instead, both officers report that they assisted Officer Kaiser with the stop based on the incident report and Officer Kaiser's description of Duffie's van. The district court erred in granting the three officers qualified immunity.[6]

---

[6]Given our conclusion here, we need not address Duffie's remaining claims against the officers in their individual capacities.

III. *Conclusion*

Accordingly, we reverse the district court's grant of qualified immunity to Officers Kaiser, Jensen, and Hite and remand for further proceedings consistent with this opinion.

SHEPHERD, Circuit Judge, dissenting.

I respectfully dissent from the majority's reversal of the district court. The information reported to the Lincoln Police Department, combined with the instructions Officer Kaiser received at the outset of his shift and his own observations, constituted "a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981). Accordingly, in my opinion, the stop of Duffie's vehicle was constitutional.

At 9:22 p.m. on November 2, 2011, Nicholas Miller, a clerk at a Lincoln, Nebraska convenience store telephoned the Lincoln Police Department and made the following report:

> Miller, clerk at Kwik Shop, stated a B/M came into the store and purchased an item. Miller stated he and Nomenyo, another clerk, asked the B/M general questions, and he wouldn't respond. Miller stated the B/M kept starring [sic] at the cash register. Nomenyo stated when he took out the garbage, he noticed the same B/M sitting in the passenger seat of a early 90s Astro style van in front of the store. Nomenyo stated the van was maroon with white stripes down the side. Nomenyo stated as he walked back into the store, the passenger held up a hand gun and acted like he was blowing smoke from the barrel. Nomenyo stated the gun looked like a silver Baretta. Miller and Nomenyo stated they did not get a license plate or see a direction of travel. The passenger was described as a B/M, late teen to early 20s, 6'0, 150 to 160 lbs., with short black hair, and brown eyes, wearing a black shirt and blue jeans. The driver was described as a B/M, late teens to early 20s, with braids or short hair, wearing a white tank top. Miller will contact officer if they have surveillance video from inside the store.

(J.A. at 134.) Later that night, at the beginning of the Lincoln Police Department's 11:00 p.m. shift, Officer Kaiser and other officers were "informed of a suspicious person call occurring at the Kwik Shop (2811 N 48th St) just a few hours prior to line-up, where the passenger of a maroon early 90s Astro van with white stripes held up a hand gun and acted like he was blowing smoke from the barrel." (J.A. at 135.) Officers were instructed *to be on the look out* for this vehicle. "The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion," and that collective knowledge may "be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." United States v. Thompson, 533 F.3d 964, 969 (8th Cir. 2008). Accordingly, the information reported by the convenience store clerks to the Lincoln Police Department is imputed to Officer Kaiser. This information and the instruction to be on the look out for the described vehicle was sufficient to support Officer Kaiser's reasonable suspicion that criminal activity was afoot and justified the stop of Duffie's van.

Although law enforcement officers may not lawfully conduct a Terry stop based on a mere hunch, "the likelihood of criminal activity need not rise to the level required for probable cause." United States v. Jones, 606 F.3d 964, 966 (8th Cir. 2010) (citing United States v. Arvizu, 534 U.S. 266, 274 (2002)). The majority states, "An objectively reasonable officer could not reliably conclude that the young man described in the report could not legally possess a firearm." However, the Supreme Court has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" Navarette v. California, 134 S. Ct. 1683, 1691 (2014) (quoting Arvizu, 534 U.S. at 277). In other words, the officers did not have to exclude the possibility that the suspect at the convenience store lawfully possessed a handgun and was acting within Nebraska's open-carry law to justify the stop.

The majority further asserts, "The incident report did not contain information sufficient to create a reasonable suspicion of criminal activity." Citing the Nebraska

-12-

third-degree assault statute and Nebraska's open-carry law, the majority reasons that the young man acted within the law because the clerk who saw the young man did not claim that the young man looked at him, pointed the gun at him, or in any other way threatened him. Nevertheless, Nebraska courts have not interpreted Nebraska's terroristic threats statute so narrowly as to require that a person point a gun directly at another person to constitute a threat. See State v. Curlile, 642 N.W.2d 517, 522 (Neb. Ct. App. 2002) (concluding that the angle at which a gun is pointed is not the determinative factor, and "the determination of whether [a gun-holder's] actions constituted a threat must be made in context, considering the facts of [the] case"). Furthermore, the Nebraska Supreme Court has held that the terroristic threats statute "need not produce a result in the victim," unlike third-degree assault which "must cause a reasonable person to suffer apprehension of being bodily harmed." See State v. Smith, 678 N.W.2d 733, 737 (Neb. 2004) (comparing Neb. Rev. Stat. § 28-311.01(a) and Neb. Rev. Stat. § 28-310(1)(b)). Regardless, the possible terroristic threat did produce some result in the clerk because the clerk called the Lincoln Police Department to report the incident. Although the young man did not point the gun at the clerk, law enforcement could interpret the young man's intimidating actions as a terroristic threat. The context in which this action occurred—at night and just after the young man had exited the convenience store after staring at the cash register and refusing to answer the clerk's general questions—combined with the instructions from his superiors to be on the look out for the described vehicle provide a sufficient basis for Officer Kaiser to form a reasonable, articulable suspicion that criminal activity may be afoot.

The majority's reliance on Florida v. JL, 529 U.S. 266 (2000), is misplaced. The thrust of Florida v. JL is that an *anonymous tip* that an individual has a gun must bear sufficient indicia of reliability. See id. at 273-74. But here, the clerks who reported the incident were not anonymous tipsters. The clerks provided their names when they gave a description of the van and the persons inside the van. Additionally, as eye witnesses to the possible unlawful activity, both clerks' "explicit and detailed

-13-

description of alleged wrongdoing, along with [their] statement[s] that the event was observed first hand, entitles [their report to] greater weight than might otherwise be the case." Illinois v. Gates, 462 U.S. 213, 234 (1983). "In evidence law, we generally credit the proposition that statements about an event and made soon after perceiving that event are especially trustworthy because 'substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation.'" Navarette v. California, 134 S. Ct. 1683, 1689 (2014) (quoting Fed. R. Evid. 803(1) advisory committee's note). We also afford greater weight to calls placed to police departments as they have "some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." Id. The clerks' incident report has more than sufficient indicia of reliability to justify the officers' stop. It is not a mere anonymous report of a person with a handgun, as was the case in Florida v. JL, but a detailed report by identified convenient store clerks who called the Lincoln Police Department and described the van, its occupants, and the passenger's suspicious and disturbing conduct with a gun.

"Reasonable suspicion depends on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. at 1690 (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). The majority concludes that "the young man did not display hostile or menacing conduct toward the clerks in the store." I disagree. The convenience store clerk's report that a young man entered the convenience store at night, stared at the cash register while ignoring the clerk's questions, and subsequently sat in a van pretending to blow smoke off the barrel of a hand gun in clear view as a clerk removed garbage from the store described disturbing and threatening events sufficient to support an officer's reasonable suspicion that criminal activity was afoot under the totality of the circumstances.

Accordingly, I would hold that the officers are entitled to qualified immunity with respect to Duffie's claim arising from the stop of his vehicle, and I would affirm

-14-

the district court with respect to Duffie's remaining claims for the reasons set forth in the District Court's opinion.

_____