BEAM, Circuit Judge,
dissenting.
I. BACKGROUND
Plaintiff John Hugh Gilmore is an attorney in Minnesota and a recognizable politi *839 cally conservative blogger and author. On June 16, 2011, two separate conferences or meetings were being held simultaneously on Nicollet Mall in downtown Minneapolis.
Gilmore attended one gathering called Right Online Conference, intending to later go meet and have dinner with friends. Matthew Glazer, a resident of Austin, Texas, was attending the other conference on the Mall, identified as NetRootsNation.[9]
As Gilmore was on his way to dinner as planned, he came in contáct with two women wearing hijabs, a head covering worn in public by some Muslim women. A discussion ensued betweén Gilmore and the hi-jab-attiréd women concerning,' as noted by the court, Ayaan Hirsi Ali, a third Muslim woman. Ms. Hirsi Ali is 'an activist supporter of women’s rights, including reformation of traditional Islamic practices. She is also the author of a New York Times bestseller entitled Infidel, a much discussed and debated publication across the religious world. The women told Gilmore that they disagreed with Ms. Hirsi Ali, seemingly in no uncertain terms.
The discussions between Gilmore and the Muslim women, as reported by Glazer, became heated and Glazer gratuitously intervened on behalf of the hijab-clad women, resolutely demanding that Gilmore should “walk away” from the women. Gilmore responded in kind, telling Glazer he “should walk away;” This prompted Glazer to seek outside support through a 911 telephone call requesting police intervention. He told the police dispatcher that “a white male with gray hair, who was wearing sandals and all black, was yelling at passersby [the Muslim women] and using racial slurs” — utterances almost always in bad taste but in this case- clearly statements protected by-the First Amendment, even assuming the statements occurred as claimed. Glazer also told the dispatcher that Gilmore was “taking photographs” of the people he was communicating with, almost never a criminal offense when done on public occasions in public places. Since Nicollet Mall may be one of the most, if not the most, public place in the State of Minnesota and the discussion involved a well-known public figure and bestselling author, it is difficult to envision that such photography could be deemed criminal in nature, especially by trained police officers. This information was relayed to two police officers on patrol. Armed with these reasonably benign facts, they proceeded to the Mall.
When defendant Minneapolis police officers Dubuc and Stewart arrived on the scene via police car, they were hailed by Glazer who repeated to them that Gilmore had been screaming racial slurs at two women wearing hijabs and that he (Glazer) at some later point in time feared that Gilmore would assault him. The evidence does not disclose the nature of this avowed fear and there is, of course, no evidence that any assault or attempted assault occurred. Furthermore, Glazer stated under oath that he did not Inform the officers of this fear of assault until after they had already arrested Gilmore at a restaurant and returned to the Mall.-
But, even if the assault claim is at all relevant in this matter, I find no precedent, and the court cites none, supporting the proposition that an alleged “fear” of an assault would have incubated any form of constitutional or other violation by Gil *840 more — at least under the politically charged circumstances at work in this case. It is telling that there is also no evidence that Glazer ever informed the police officers of his own intentional, unprovoked, interventionist intrusion into Gilmore’s First Amendment-protected discussion with the Muslim women and later with Gilmore.
Between the time of the 911 phone call and arrival of the police, Gilmore had departed from the area to meet his friends at The News Room restaurant as originally planned. Thus, Glazer was the sole source of information about Gilmore presented to the defendant police officers both through the 911 call and the in-person communications at the Mall prior to Gilrhore’s unconstitutional arrest at the restaurant.'
The record establishes that Officers Du-buc and Stewart split up as they entered the restaurant referred to by Glazer to search for the white male with' gray hair wearing all black and sandals. Dubuc was first to locate Gilmore eating at a table. Diibuc approached Gilmore and without inquiry of any kind, ordered him to accompany Dubuc outside the restaurant. Gilmore responded, “No I’m good here.” Du-buc claims to have repeated his request and that Gilmore stated that he (Gilmore) was a lawyer, knew his rights and stated to Dubuc “you do not have PC” (probable cause), Dubuc then told Gilmore that if he did not walk out with him, he (Dubuc) “would have to physically remove him from the establishment.” When Gilmore did not submit to this threatened custody, Dubuc states that he applied “a left wristlock and began pulling Gilmore’s arm in an upward motion,” and Gilmore, submitting to Du-buc’s physical acts of custody, was removed from'the restaurant and confined in a police car. To make his custody more secure, he was placed in handcuffs by. the police officers.
Gilmore remained in this custodial arrangement until he was later transferred to a police transport vehicle, taken to Hen-nepin County Jail and booked for disorderly conduct and obstruction of legal process, both misdemeanors under Minnesota law. He was released from jail the next morning and later all charges were prudently dropped after the prosecutor learned there was a substantial dispute in the facts surrounding the arrest and also some concerns related to the credibility of some of the witnesses. Prior to the arrest by Officer Dubuc in the restaurant, Gilmore was never asked for his side of the story concerning the events on Nicollet Mall.
As Gilmore was confined in the police car at the Mall as a result of his arrest in the restaurant, the police officers, perhaps realizing the constitutional infirmity of the restaurant arrest, solicited Glazer to prepare, and tutored him in the completion of, a “citizen’s arrest form” supplied by them. And while not relevant to the false arrest at the restaurant, as I will shortly explain, it should be noted that when the police officers, subsequent to the arrest, finally got around to talking to persons at the scene other than Glazer and the co-complainant Muslim women, the officers were approached by an acquaintance of Gilmore’s, identified as Paul Carlson. Carlson informed the police that he observed the alleged confrontation that occurred prior to their arrival and stated that he “could not hear what was being said but [saw] that Gilmore was eight to ten feet away from the group of people [involved] and [Gilmore] had his hands in his pockets.”
With regard to the occurrences at the restaurant, the court contends that there “is a disputed fact whether Gilmore was given the opportunity to relay his version of events to the officers before being placed in handcuffs or in the squad car.” Ante at 833 n.4. There is no evidence of *841 any such dispute, but the issue is irrelevant. Officer Dubuc states under oath that he arrested Gilmore with the wristlock at the dinner table Without offering any such opportunity before dragging him to the squad car waiting in the street. Accordingly, it is clear Gilmore was not asked to give “his version of events” prior to the unconstitutional Fourth Amendment violation.
In any event, the court correctly concedes that “[b]ecause wé must construe the facts [at issue] most favorably to Gilmore [under the motion to dismiss his claims via summary judgment], we assume the officers failed to ask for his side of the story.” Ante at 838 n. 4. And as the court further states “[i]n considering information given by a victim of a crime, an officer need not conduct a ‘mini-trial’ before effectuating an arrest although he cannot avoid ‘minimal further investigation’ [like seeking the potential arrestee’s side of the story] if it would have exonerated the suspect.” Ante at 833 (quoting Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011)).
Here, the only purported victims of a crime prior to the arrest were Glazer and, possibly, the Muslim women. Thus, minimal further investigation, by asking for Gilmore’s side of the story and construing the facts most favorably to Gilmore as required, would have disclosed that his action with Glazer — the vigorous public debate and perhaps the alleged photography — were acts fully protected by the First Amendment.
II. DISCUSSION
Although not particularly relevant under the circumstances of this dispute, I concede that the court accurately sets forth the elements of misdemeanor conduct under the City of Minneapolis ordinances and the Minnesota state statute. I also concede that probable cause for such offenses is factually “determined ‘at the moment [an] arrest [is] made,’ [and] any later developed facts are irrelevant to the probable cause analysis for an arrest.” Amrine v. Brooks, 522 F,3d 823, 832 (8th Cir. 2008) (quoting United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004)).
In this case, the arrest at issue occurred at the moment the physical, wristlock custody of Gilmore commenced in The News Room restaurant. Thus, at that crucial time, defendant police officers had only facts related by the police dispatcher and those obtained during their brief encounter with Glazer on Nicollet Mall, At that point, there was neither probable cause nor “arguable” probable cause established, and any Minneapolis ordinance or state statutory verbiage to the contrary would violate Gilmore’s First Amendment rights.
Officer Dubuc was informed by Gilmore that he possessed no probable cause to arrest. While probable cause is a question of law, it must be fundamentally based upon factual episodes emanating from specific unlawful actions. Here, Gilmore’s heated public discussions concerning Ms. Hirsi Ali, coupled with “taking photographs” on a public street and rejecting Glazer’s demand that he “walk away,” were all acts fully protected by the First Amendment’s Free Speech and Assembly Clauses.
In a supplemental report Officer Dubuc stated that Gilmore may have been intoxicated, was “mad” and would not communicate with him about the happenings at Nicollet Mall. Such statements were, of course, superfluous concerning the earlier arrest. Gilmore, believing he had been arrested and incarcerated in the police car without probable cause, had every right under the Fifth Amendment to remain silent. It must also be noted, as does the court . itself, that Gilmore was never *842 charged with intoxication, only disorderly conduct and obstruction of legal process.
In the face of these questions of fact and law, the court contends that the officers, even if ultimately proven wrong, are nonetheless' entitled to a qualified immunity defense. The precedent of this circuit repudiates such a result.
“We review de novo the district court’s grant of summary judgment based on qualified immunity.” LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013). And there can be no argument supportive of the idea that the Fourth Amendment permits a police officer to arrest and incarcerate a citizen without probable cause. “The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated _” U.S. Const, amend. IV. “The doctrine of qualified immunity protects government officials ‘from liability for civil damages [only] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Duffie v. City of Lincoln, No. 15-2431, 834 F.3d 877, 881, 2016 WL 4435650, at *3 (8th Cir. Aug. 23, 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). And, in the face of the record and controlling constitutional law, there can be no way that a reasonable person, especially a reasonable police officer, would not have known that Gilmore’s arrest was wholly unconstitutional.
“Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person [arrested] of criminal activity.” Id. at 883, 2016 WL 4435650, at *4 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). But, Officers Dubuc and Stewart relied solely on self-serving and incomplete statements from Glazer that did not contain information sufficient to create probable cause or even arguable probable cause to believe that Gilmore had committed a crime — specifically “disorderly conduct” as charged. And, had the officers reasonably sought the other side of the story as required by law, there would have been even less reason to physically accost and arrest Gilmore at dinner. See Borgman, 646 F.3d at 523. Accordingly, the officers are not entitled to qualified immunity. See generally Duffie, 834 F.3d at 882-85, 2016 WL 4435650, at *4-5.
The officers also charged Gilmore with obstruction of legal process, in violation of Minnesota Statute § 609.50 1(1). This charge sheds some light on the mind set of the officers in making the disorderly conduct charge as well.
The statutory language is comprehensive, ambiguous and vague, It has, however, been carefully cabined by the Minnesota Supreme Court in State v. Tomlin, 622 N.W.2d 546 (Minn. 2001) and State v. Pederson, 840 N.W.2d 433 (Minn. Ct. App. 2013).
The court adroitly avoids discussing this charge by hanging its “official immunity” hat solely on the disorderly conduct charge. Ante at 834 n.7. This was very wise because, as .limited by the Minnesota Supreme Court, an arrest under the statute requires a physical act against the arresting officer or an equivalent confrontation using “fighting words.” Tomlin, 622 N.W.2d at 548. There is, of course, not a scintilla of evidence to support this charge. When the obstruction charge is considered in concert with the derisive and unnecessary actions — uprooting and destroying of Gilmore’s political sign on Nicollet Mall— the created ambience becomes somewhat troublesome. It also makes Gilmore’s Mo-nell claim decidedly more extant.
*843 III. CONCLUSION
In epilogue, I fully recognize and concede that policing is difficult, dangerous and uncertain work. Everyone who undertakes it should be respected. Today its rigors are, in my view, second only to military combat duty. So, my concerns in this case are in no way in derogation of these officers. When mistakes occur, however, they should be rectified.
It is possible that a properly instructed jury could reach a verdict for the defendants after hearing and reviewing all the evidence at a trial. On the other hand, a directed verdict on the issue of liability may also be the result. In any event, I believe the magistrate judge, the first judicial officer to deal with the facts and circumstances, was correct and a trial should be conducted.
Accordingly, I respectfully dissent.

. Although not mentioned by the district court, the record discloses that Mr. Glazer is, indeed, the President and Founder of Progress Texas, a politically liberal Texas-based organization, leading .one to suspect that his intervention, as discussed below, was a conservative/progressive political discussion not only protected but encouraged by the First Amendment.