# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1390

_____

James Robert Ross

*Plaintiff - Appellant*

v.

City of Jackson, Missouri; Ryan Medlin, individually and in his official capacity as a police officer; Anthony Henson, individually and in his official capacity as a police officer; Toby Freeman, individually and in his official capacity as a police officer

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: January 11, 2018
Filed: July 26, 2018

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

James Robert Ross appeals the district court's grant of summary judgment to Ryan Medlin, Anthony Henson, and Toby Freeman, three police officers employed

by the City of Jackson, Missouri.[1]  Ross argues that the district court erred in concluding that the officers were entitled to qualified immunity on his 42 U.S.C. § 1983 claim alleging the violation of his constitutional rights under the First and Fourth Amendments.

## I.

On January 25, 2015, James Ross was a 20-year-old resident of Cape Girardeau, Missouri, and an active user of the social media website, Facebook. Facebook allows users to connect with each other by establishing "friend" relationships and posting items to a personal feed that can be viewed by the user's friends. That evening, one of Ross's Facebook friends posted an image[2] (or meme) that showed a number of different firearms below the title "Why I need a gun."  Above each type of gun was an explanation of what the gun could be used for—e.g., above a shotgun: "This one for burglars & home invasions"; above a rifle with a scope: "This one for putting food on the table"; and above an assault rifle: "This one for self-defense against enemies foreign & domestic, for preservation of freedom & liberty, and to prevent government atrocities."  Ross interpreted this post as advocating against gun control measures.  Ross, an advocate in favor of gun control measures, commented on the post:  "Which one do I need to shoot up a kindergarten?"  Ross then logged off Facebook and went to bed.

---

[1]The district court also granted summary judgment to the City on Ross's claim for municipal liability.  Ross has not appealed that ruling.

[2]The post itself is not contained in the district court record, because its author deleted it prior to the events that precipitated this lawsuit.  A partial screenshot of the post, however, was admitted into evidence.  The parties do not dispute the content and nature of the post.

The post (including Ross's comment) was soon deleted, but not before a cousin of the person who originally posted the meme took a screenshot of it. The cousin then forwarded the screenshot to a yet another person, a mutual cousin, without any annotation or additional commentary. That individual, in turn, shared it with her husband—Ryan Medlin, a member of the City of Jackson Police Department. Around 5:30 p.m. on January 26, 2015, Medlin, who was off duty at the time, forwarded the screenshot to two other members of the Jackson Police Department, Anthony Henson and Toby Freeman. Henson and Freeman were off duty as well, but they followed up on the post when they arrived at work. Freeman, a member of the investigation division, determined that James Ross had authored the comment and that he worked at the Casey's gas station in Fruitland, Missouri. None of the officers conducted any additional investigation into either Ross or the post before Henson and Freeman drove to Casey's.

Meanwhile, Ross had started his shift at Casey's at 2 p.m. on January 26. Henson and Freeman arrived between 7 and 8 p.m. Ross was in the kitchen with three other employees when one of the officers asked to speak with him. Ross did not know the person was a police officer (he was not in uniform) and assumed he was a customer. When Ross walked out of the kitchen, the officers immediately arrested him. One of the officers told him they were there because of a post on the internet, but neither officer asked Ross any questions about the post or his comment. Nor did they ask Ross any questions about his interest in, or ownership of, firearms. Unprompted, however, Ross told the officers that his comment on Facebook was not serious, that it was meant to be a joke, and that he was willing "to clear this up right here."

Ross was placed in handcuffs and escorted out of the store to a police car in full view of his co-workers. Once Ross was in the car, the officers read him his Miranda rights and took him to the police station. At the station, Ross was questioned by Medlin. Ross wrote out a statement explaining what he meant by his

comment on the post. He was then interviewed—wherein Ross was able to further explain what happened. According to Ross, several officers at the station told him they did not think the case was likely to go any further than the prosecuting attorney's office. However, Ross was not allowed to leave. He was held at the Jackson Police Station until the next day, during which time he was served with a warrant for "Peace Disturbance." The next day, he was transferred to the Cape Girardeau County Jail where he was held for another two to three days, until he bonded out by paying $1000 in cash. At some point during that period, Ross was formally charged with the class B misdemeanor of "Peace Disturbance" under Mo. Rev. Stat. § 574.010(1)(c) (2015). On April 7, 2015, the charges against Ross were formally dismissed.

In June 2015, Ross filed a lawsuit under 42 U.S.C. § 1983 alleging that the officers had violated his constitutional rights under the First and Fourth Amendments.[3] After discovery, based on the undisputed facts, both parties moved for summary judgment. The district court granted the officers summary judgment, reasoning that they were entitled to qualified immunity because the rights that Ross asserted had not been clearly established at the time that they were violated. Ross appeals the district court's ruling.

---

[3]The district court and the parties have treated these constitutional claims as distinct and analyzed them separately. However, as the Supreme Court recently explained, when an alleged First Amendment violation "occurred during the course of investigative conduct that implicates Fourth Amendment rights, the First and Fourth Amendment issues may be inextricable." See Sause v. Bauer, No. 17-742, slip. op. at 2–4, 2018 WL 3148262, at *1 (June 28, 2018) (per curiam). We do not understand Ross to be making a stand-alone First Amendment argument, e.g., alleging retaliatory arrest. To the extent that he intended to so, any such allegations are not adequately supported by his pleadings.

## II.

Qualified immunity is designed to shield officers from liability when they engage in conduct that is not clearly outside the realm of what the Constitution permits. As the Supreme Court has said:

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. While th[e] Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.

White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam) (cleaned up) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)). We review a district court's grant of summary judgment on the basis of qualified immunity de novo. LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013). We apply the same standard as the district court in assessing the facts: We view the record in the light most favorable to the nonmoving party, in this case, Ross. Hollingsworth v. City of St. Ann, 800 F.3d 985, 989 (8th Cir. 2015). In determining whether qualified immunity should apply, the court engages in a two-step inquiry. First, we must determine whether a constitutional right has been violated. Pearson v. Callahan, 555 U.S. 223, 232 (2009). Then, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. While we are not required to apply the steps sequentially, "it is often beneficial" to do so. Id. at 236; see also Baribeau v. City of Minneapolis, 596 F.3d 465, 474 (8th Cir. 2010).

Under the Fourth Amendment, a person has a right "to be secure in [his] person[]" and warrants may not issue "but upon probable cause." U.S. Const. amend. IV. "It is well established that a warrantless arrest without probable cause violates

an individual's constitutional rights under the Fourth and Fourteenth Amendments." Joseph v. Allen, 712 F.3d 1222, 1226 (8th Cir. 2013) (quoting Marksmeier v. Davie, 622 F.3d 896, 900 (8th Cir. 2010)). Put differently, a constitutional violation occurs when there is a warrantless arrest that is not supported by probable cause to believe that a crime has been committed.

"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt" under state law. Baribeau, 596 F.3d at 474 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Id. (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004)). Therefore, we examine the state statute upon which Ross's arrest was based. Id. at 474–78. Ross was arrested under Mo. Rev. Stat. § 574.115.1(3) (2015),[4] which as relevant, made it a crime to "communicate[] a threat to cause an incident or condition involving danger to life . . . [w]ith reckless disregard of the risk of causing the evacuation, quarantine or closure of any portion of a building, inhabitable structure, place of assembly or facility of transportation." Missouri courts have imposed a narrowing construction on this language—in keeping with constitutional dictates[5]—such that it applies only to "true threats." State v. Metzinger, 456 S.W.3d 84, 95–96 (Mo. Ct. App. 2015) (using the definition of "true threats" from Virginia

---

[4]Missouri's statutory provisions relating to "Making a terrorist threat" have since been reconfigured, effective January 1, 2017. See Mo. Rev. Stat. §§ 574.115, 574.120, 574.125 (2017).

[5]The First Amendment requires that government "make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "Free speech protections do not extend, however, to certain categories or modes of expression . . . [and] threats of violence . . . fall within the realm of speech that the government can proscribe without offending the First Amendment." Doe v. Pulaski Cty. Special Sch. Dist. (Pulaski), 306 F.3d 616, 622 (8th Cir. 2002) (en banc) (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 382–83 (1992), and Watts v. United States, 394 U.S. 705 (1969)).

v. Black, 38 U.S. 343, 344 (2003)); In re C.G.M., II v. Juvenile Officer, 258 S.W.3d 879, 883 (Mo. Ct. App. 2008) (same).

In particular, Missouri courts have held that it was not a violation of this statute when a "defendant's communication was not a 'true threat,' as defined by the United States Supreme Court in Black, because it was not a declaratory statement, did not express an intent to cause an incident involving danger to human life, and did not place his friend in fear that the threat would be carried out." Metzinger, 456 S.W.3d at 96 (discussing the holding of C.G.M.). And, similarly, in Metzinger, the Missouri court concluded that posts on the social media website Twitter referencing "pressure cookers and allusions to the Boston Marathon bombing were tasteless and offensive, [but] the context of [the defendant's] tweets was such that a reasonable recipient would not [have] interpret[ed] them as serious expressions of an intent to commit violence." Id. at 97.

In determining whether an officer is entitled to qualified immunity for a warrantless arrest—i.e., whether the Fourth Amendment right was clearly established—we have explained:

> An officer . . . is entitled to qualified immunity for a warrantless arrest if the arrest was supported at the time by at least "arguable probable cause." Probable cause exists when the totality of the circumstances at the time of the arrest is sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense. Arguable probable cause exists even where an officer mistakenly arrests a suspect believing [the arrest] is based on probable cause if the mistake is "objectively reasonable."

Joseph, 712 F.3d at 1226 (cleaned up) (quoting Borgman v. Kedley, 646 F.3d 518, 522–23 (8th Cir. 2011)); see also Baribeau, 596 F.3d at 478. Our determination of whether arguable probable cause exists is informed by our assessment of what

information the officer knew at the time that he made the probable cause determination, and what "a reasonably thorough investigation" would have uncovered about the likelihood that a crime had been committed. Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999). "An officer need not conduct a mini-trial before making an arrest," but it cannot be said that even arguable probable cause is present where "a minimal further investigation would have exonerated the suspect." Id. (cleaned up).

The officers were justified in their efforts to investigate Ross's post. In current times and in light of current events, the statement demonstrated, at a minimum, questionable judgment. But the state statute at issue does not apply to any speech that is not a "true threat," and—under Missouri precedent—a reasonable officer would have understood that. See Baribeau, 596 F.3d at 478–79 ("The state of the law at the time of the arrest[] was clearly established such that a reasonable person would have known there was no probable cause to arrest the plaintiffs . . . under the [relevant] statute."). As the court in Kuehl noted, "officers have a duty to conduct a reasonably thorough investigation" only when there is an "absence of exigent circumstances" and they would not be "unduly hampered" by "wait[ing] to obtain more facts before seeking to arrest." 173 F.3d at 650 (quoting United States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir. 1987)). And if any further investigation had led the officers to believe there was an immediate or imminent danger, they would have been justified in acting on that information. Here, however, no exigent circumstances prevented the officers from gathering additional information before making an arrest.

In this case, even a "minimal further investigation" would have revealed that Ross's post was not a true threat. See Pulaski, 306 F.3d at 623.[6] The officers

---

[6]Describing "a nonexhaustive list of factors relevant to how a reasonable recipient would view the purported threat": "1) the reaction of those who heard the alleged threat; 2) whether the threat was conditional; 3) whether the person who made the alleged threat communicated it directly to the object of the threat; 4) whether the

-8-

conducted no investigation into the context of the statement,[7] Ross's history of violence,[8] or Ross's political beliefs about gun ownership or gun control measures. See Kuehl, 173 F.3d at 650. Viewing the evidence in the light most favorable to Ross, the officers saw the comment, discovered where Ross worked, and then went to his job site with the sole intent of placing him under arrest. Ross tried to explain what was meant by his comment and provide the officers with more context about the post, but the officers did not give him that opportunity until after he was booked at the police station. See Kuehl, 173 F.3d at 650 ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence . . ."); cf. Duffie v. City of Lincoln, 834 F.3d 877, 883 (8th Cir. 2016) (examining "the totality of the circumstances—the whole picture" in concluding that officers lacked reasonable suspicion to initiate a traffic stop). And, after interviewing Ross, officers indicated that they did not think the charges would stick, i.e., they did not believe he had truly

_____

speaker had a history of making threats against the person purportedly threatened; and 5) whether the recipient had a reason to believe that the speaker had a propensity to engage in violence." Cf. D.J.M. ex rel D.M. v. Hannibal Pub. Sch. Dist. No. 60, 647 F.3d 754, 764 (8th Cir. 2011) (upholding the actions of school officials and police officers where—unlike here—these factors indicated that the threat was credible without any further investigation).

[7]For example, the original meme was about why someone might need a gun, and gave examples explaining what the various types of guns could be used for. In that context, Ross's comment—which directly paralleled the language of the meme— was responding by suggesting another, far more upsetting, use to which he believed such a gun might be put. See Watts, 394 U.S. at 708 ("The language of the political arena . . . is often vituperative, abusive, and inexact.") (citation omitted)). The comment was in the form of a rhetorical question, which identified no school where a shooting would happen. And the comment was made on a social media website that the Supreme Court has recently called "a quintessential forum for the exercise of First Amendment rights" analogous to "a street or park." Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017).

[8]The record shows he had none.

made a "terrorist threat."  Ross was nonetheless charged and held in custody for several days until he was able to post bail.  In sum, it is beyond debate that—had the officers engaged in minimal further investigation—the only reasonable conclusion was that Ross had not violated § 574.115.1(3).

## III.

We reverse the district court's grant of summary judgment to the officers based on qualified immunity and remand the case for further proceedings consistent with this opinion.

_____