# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————

No. 97-3251

———————

United States of America,　＊
　　　　　　　　　　　　　＊
　　　　　Appellee,　　　　＊
　　　　　　　　　　　　　＊　Appeal　from　the　United
　　　　　　　　　　　　　　　States
　　v.　　　　　　　　　　＊　District Court for the
　　　　　　　　　　　　　＊　District of North Dakota
Juvenile TK,　　　　　　　＊
　　　　　　　　　　　　　＊
　　　　　Appellant.　　　＊

———————

Submitted:　　　December 10, 1997

Filed:　　　January 12, 1998

———————

Before McMILLIAN, JOHN R. GIBSON, and MURPHY, Circuit
　　Judges.

———————

McMILLIAN, Circuit Judge.


　　Appellant TK, a juvenile and a Native American tribal
member of the Three Affiliated Tribes on the Fort
Berthold Reservation in North Dakota, appeals from a
final judgment entered in the United States District
Court[1] for the District of North Dakota pursuant to TK's
conditional guilty plea to robbery and possession of a

---

[1]The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

handgun in violation of 18 U.S.C. §§ 1153 and 2111, and 18 U.S.C. § 922(x)(2)(A), respectively.  TK was sentenced to thirty months probation and restitution of two dollars. For reversal, TK argues that his Fourth Amendment rights under the United States Constitution as applied to Sovereign Indian Reservations through the Federal Indian Civil Rights Act, 25 U.S.C. § 1302, were violated because the arresting officers lacked  reasonable suspicion to conduct the investigative stop that culminated in his arrest.  For the reasons discussed below, we affirm the judgment of the district court.

## Jurisdiction

Jurisdiction was proper in the district court based upon 18 U.S.C. § 3231.  Jurisdiction on appeal is proper pursuant to 28 U.S.C. § 1291.  The notice of appeal was timely filed under Rule 4(a) of the Federal Rules of Appellate Procedure.

## Discussion

On Friday, March 29, 1997, TK and his friends drove to the City of New Town, North Dakota, after attending a basketball game in White Shield, North Dakota.  New Town is located on the Fort Berthold Reservation.  There are approximately 1500 to 1700 people who reside in the area. There is also a casino just outside of New Town that is open 24 hours a day.  According to Tribal Police Officer Samuel James Lincoln, there are cars entering and leaving the casino area all the time, even at four o'clock in the morning.  Transcript of Suppression Hearing ("Transcript") at 24.

Dragswolf Village is an area located about five miles west of New Town. Dragswolf Village is a separate community with an estimated population of approximately two hundred. At approximately 3:10 a.m. on March 30, 1997, Officer Lincoln received a dispatch in his squad car that "a man in [Dragswolf Village] had broken out a window to a vehicle and that he had gotten into a gray vehicle and that he had a gun." Id. at 8. Officer Lincoln then informed Officer Frank Felix, the driver of

the squad car, of the report and they both proceeded to Dragswolf Village to investigate the call.

According to Officer Lincoln, the only information that they possessed at that point was that the suspect was a man in a gray car; they had no license plate number or house number for the location of the incident. Id. at 10. Officer Lincoln testified that they tried to obtain a house number, but did not receive any additional information. Id. Officers Lincoln and Felix then looked around Dragswolf Village for about 15 minutes, but did not see any gray cars.

At approximately 3:49 a.m., Officer Lincoln received a dispatch stating that "there was a guy at the SuperPumper and he brandished a weapon and had gotten into a gray vehicle." Id. at 11-12. (The SuperPumper is a gas station/convenience store in New Town.) According to Officer Lincoln's testimony that was the only information he and his partner received regarding the SuperPumper incident; the attendant at SuperPumper who reported the incident did not provide a license plate number. Id. at 12.

At 3:51 a.m., Officer Lincoln called the dispatch for more information. Specifically, he and Officer Felix wanted to know if the person who reported the incident actually worked at the SuperPumper and if that person could better describe the perpetrator and the vehicle. The officers did not receive any additional information. (It was later revealed that Darwin Morsett, a SuperPumper employee, was the person who had reported the incident from the SuperPumper.)

At approximately 3:56 a.m., Officer Lincoln was driving eastbound from Dragswolf Village on Main Street when he observed a gray vehicle making a U-turn in a commercial parking lot about one and one-half to two blocks from the SuperPumper.  He informed Officer Felix that "that was a gray car and that [they] should check it out."  Id. at 15.  The gray car exited the parking lot onto Main Street,

turned left heading southbound on West Avenue, and accelerated. The officers followed the vehicle in their marked squad car. The squad car has door decals for "Bureau of Indian Affairs Police" on each side and has a visible red light bar on the roof.

Halfway down the block on West Avenue, Officer Felix activated the squad car's red lights. According to the officers, when the squad car pulled up behind the gray car, the gray car made a quick left onto Second Street South for a short distance and then stopped. The officers believed, based on their experience, that the gray car's quick turn and acceleration, when there was no other traffic, seemed suspicious and that these driving tactics were to evade the police. Officer Lincoln testified, however, that the vehicle did not do anything illegal before it was pulled over. Officer Felix further admitted that, at the point at which the car was stopped, the only descriptions that they had received were of a gray car and a man with a gun.

When Officers Lincoln and Felix approached the vehicle, TK was in the front passenger seat and his brother, Sheldon K, was the driver. Jason S, a friend of theirs, was in the back seat. Officer Felix recognized TK as the nephew of his (Officer Felix's) ex-wife. The officers also noted that TK and Jason S appeared to be intoxicated and, as juveniles, were violating the 11:00 p.m. curfew established under the Tribal Code and New Town City Code. Both TK and Jason S were arrested for violating the curfew law and for public intoxication. TK was searched and two packs of Marlboro cigarettes were seized from his person. After Sheldon K was ordered out

of the car and brought to the police cruiser for a license check, he (Sheldon K) ran off on foot.  No weapon was ever discovered.

Early in the morning on March 29th, Darwin Morsette, the SuperPumper attendant who had  reported the robbery, identified TK as the man with the gun who had taken a pack of cigarettes at the SuperPumper in a line-up conducted at the  police  department.   Earlier,  but  after  the investigative stop, the police had obtained a written

description of the perpetrator from Morsette which matched TK.  TK denied that he was involved in either of the reported incidents.

TK was later charged by information with juvenile delinquency in violation of 18 U.S.C. §§  5031-5042 for committing robbery under 18 U.S.C. §§ 1153 and 2111, assault with a dangerous weapon under 18 U.S.C. §§ 113(a)(3) and 1153, and possession of a handgun by a juvenile under 18 U.S.C. § 922(x)(2)(a).  TK moved to suppress any evidence seized or gathered at the time he was taken into custody on March 29th  on the ground that the police officers did not have reasonable suspicion to stop the car in which he was riding.  He also moved to suppress statements that he made to an officer on March 31, claiming that the statements were given without Miranda warnings and were involuntary.  A suppression hearing was held on June 4, 1997.  By order of June 19, 1997, the district court denied the motion in its entirety.[2]

On July 7, 1997, by way of an Alford plea,[3] TK made a conditional guilty plea to count one (robbery) of the juvenile delinquency information, reserving his right to appeal the denial of his suppression motion.  On August 8, 1997, TK received a juvenile disposition of 30 months probation and restitution of two dollars.

---

[2]TK appeals the denial of the motion to suppress as to the investigative stop only.

[3]Under North Carolina v. Alford, 400 U.S. 25 (1970), a court may accept a guilty plea  from and impose a sentence on a defendant who maintains his or her innocence, provided that the court finds an adequate factual basis for the plea.

An officer may conduct a Fourth Amendment stop to investigate a crime only if the officer has a reasonable suspicion that that person had committed or was committing a crime. <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968) (A police officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'").

"'[T]he police must point to particular facts and inferences rationally drawn from those facts that, when viewed under the totality of the circumstances and in light of the officer's experience, create a reasonable suspicion of criminal activity.'" Marti v. City of Maplewood, 57 F.3d 680, 685 (8th Cir. 1995) (Marti) (quoting United States v. Weaver, 966 F.2d 391, 394 (8th Cir.), cert. denied, 506 U.S. 1040 (1992)).

This court reviews the district court's findings of historical fact for clear error and reviews the determination of whether there was reasonable suspicion *de novo*. See Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996); United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1996), cert. denied, 118 S. Ct. 454 (1997). In conducting its *de novo* review, this court must give due weight to inferences drawn by resident judges and local law enforcement officers from historical facts. Ornelas, 116 S. Ct. at 1663.

In the instant case, the district court made eight express findings of fact[4] and considered the entire record before it, including the evidence presented at the suppression hearing. District Order at 1 (June 19, 1997). In his reply brief, TK contests the government's reliance on certain evidence presented at the suppression hearing. Reply Brief at 6. Specifically, TK challenges the officers' testimony that the car in which he was stopped was the only one in the area. TK maintains that there is local and tourist vehicular traffic at all hours of the night in New Town, particularly because of the 24-hour

---

[4]Of these eight findings, only two pertain to events which occurred prior to the investigative stop. Hence, the remaining six findings are not relevant to our analysis. See Ornelas v. United States, 116 S. Ct. 1657, 1661-62 (1996) (emphasis added) ("The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred *leading up to* the stop or search, and then the decision whether these historical facts . . . amount to reasonable suspicion or probable cause.").

casino in operation.  TK relies heavily upon the following statement of the district judge for support: "The Court can almost take judicial notice that there's usually lots of things going on on a Friday night in New Town . . . ." Transcript at 27.  This statement, however, does not constitute judicial notice that there

was a high volume of vehicular traffic in the surrounding area as TK contends.[5] Moreover, the district judge's observation does not necessarily support TK's theory of the case, especially in light of the arresting officers' testimony to the contrary.

In addition, while TK does not deny that the gray car made quick turns in an apparent effort to evade police, he argues that this allegation is controverted by the officers' testimony that the car did not violate any traffic laws before it was stopped. Moreover, TK notes that the district court did not make an express finding of fact as to this issue. However, we have held that both innocent and criminal acts can create reasonable suspicion. See United States v. Sokolow, 490 U.S. 1, 9 (1989) (holding that several innocent activities may create reasonable suspicion under the totality of the circumstances); United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990) (holding that even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances). Furthermore, police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive. See, e.g., United States v. Raino, 980 F.2d 1148, 1149-50 (8th Cir. 1992) (finding reasonable suspicion where police, responding to late-night reports of fired shots, saw vehicle parked in closed parking lot and observed evasive and suspicious movements), cert. denied, 507 U.S. 1011 (1993). Such

---

[5] Rule 201 of the Federal Rules of Evidence permits courts to take judicial notice of adjudicative facts not subject to reasonable dispute in that the facts are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Id. Without determining whether the general traffic conditions in New Town are subject to judicial notice in this context, this court finds that the district judge's statement clearly falls short of taking judicial notice.

conduct in conjunction with other factors may form a basis for reasonable suspicion.  Id.

Finally, this court's *de novo* review permits us to consider the totality of the circumstances in determining whether reasonable suspicion exists.  United States v.

<u>Dodson</u>, 109 F.3d 486, 488 (8th Cir. 1997); <u>United States v. Bloomfield</u>, 40 F.3d 910, 918 (8th Cir. 1994) (*en banc*), <u>cert. denied</u>, 514 U.S. 1113 (1995). We find it unnecessary to rely on the contested facts. We focus our analysis on the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop. TK does not challenge the district court's implicit reliance on these facts; rather TK argues that the vague description of the vehicle and the perpetrator from an unreliable informant, coupled with the absence of any observation of illegal activity by the officers, is insufficient to support a finding of reasonable suspicion under the Fourth Amendment. More specifically, TK emphasizes that the vehicle was doing nothing illegal when it was stopped and that the officers did not have the license number, make, model, year of manufacture of the car, or any physical description of the suspect other than that he was a man. Moreover, TK maintains that, given the amount of traffic that is generally in the area, there was no reason to single out the gray vehicle in which he was a passenger.

TK relies primarily on three cases for support. The first case, <u>United States v. Jones</u>, 998 F.2d 883 (10th Cir. 1993) (<u>Jones</u>), involves facts somewhat similar to those in the instant case. In <u>Jones</u>, police received a call on a weekday afternoon from an apartment manager that one of his tenant's had reported that two African-American men had pounded hard on the door of a neighbor's apartment and that one of the men was holding a gun. <u>Id.</u> at 884. The tenant then came on the line and told the police that the men had left without entering the apartment, driving a black Mercedes westbound. <u>Id.</u> The tenant further stated that both men were wearing a lot of jewelry and that one was wearing a purple sweater. <u>Id.</u> The Tenth Circuit held that such statements were "very meager evidence" to justify a stop of two African-American men in a black

-14-

Mercedes at 4:00 p.m. when their clothes were not seen by the officers before the stop.  Id.  Moreover, the court noted that the information came from an informant with whom the police had no experience.  Id. at 886.

In the second case, <u>Thompson v. Reuting</u>, 968 F.2d 756, 759 (8th Cir. 1992) (<u>Thompson</u>), this court held that an experienced officer who conducted an investigative stop of a brown Chevy Nova in a high-crime, low-traffic area at night, did not have reasonable suspicion based on reports that "a suspicious brown Chevy Nova" was seen in the area. <u>Id.</u> This court reasoned that "[t]hese facts as a matter of law do not establish . . . an objectively reasonable suspicion that the occupants were engaged in criminal activity in order to justify stopping it under <u>Terry v. Ohio</u>." <u>Id.</u> (citation omitted). In short, there was no reason to suspect that criminal activity was afoot. Similarly, in <u>Brown v. Texas</u>, 443 U.S. 47 (1979), the Supreme Court reversed a conviction where officers stopped and searched the defendants only after viewing them in an area notorious for drug trafficking and were unable to articulate any basis for their conclusion that the defendants "looked suspicious." <u>Id.</u>

These cases are easily distinguishable from the case at bar. Here, the officers had reasonable suspicion based on the two dispatches released approximately forty minutes apart in the very early morning hours, identifying a male with a gun in a gray vehicle engaging in clearly criminal activity and, more important, the vehicle's temporal and geographic proximity to the crime scenes. Indeed, the gray car was spotted no more than two blocks away from the scene of the robbery and within five minutes of the second dispatch. By contrast, in <u>Jones</u>, the vehicle was seen a mile and a half west of the alleged disturbance, the alleged disturbance was not definitively criminal in nature, and the court made no mention of the traffic conditions. <u>Brown</u> is similarly distinguishable based on the time of day of the stop and the lack of unusual activity. Moreover, in both <u>Thompson</u> and <u>Brown</u> there was no report that the defendants were even involved in a crime.

Several apposite cases in this circuit support a finding of reasonable suspicion based on comparable evidence. See Marti, 57 F.3d at 685 (holding that police had reasonable suspicion where defendants were stopped because they and their vehicles matched the description of suspects who had moments before caused a drunken

disturbance at a local convenience store and who appeared to be driving recklessly when they left the store); <u>Raino</u>, <u>supra</u>, 980 F.2d 1148; <u>United States v. Wright</u>, 565 F.2d 486 (8th Cir. 1977) (holding that police were justified in stopping defendants who were near to scene of robbery, unusually-dressed, and behaved suspiciously upon viewing the officers); <u>Orricer v. Erickson</u>, 471 F.2d 1204 (8th Cir. 1973) (holding that officers who stopped car bearing out-of-state license plates during early morning hours, within hour of reported burglary, in small town with little vehicular and pedestrian traffic had reasonable suspicion for investigative stop).  Although there is no evidence that the police had any experience with either informant in the instant case, this fact alone is not dispositive where there are independent indicia of reasonable suspicion.  See <u>United States v. Dawdy</u>, 46 F.3d 1427, 1429 (8th Cir.) (holding that "[f]actors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence."), <u>cert. denied</u>, 116 S. Ct. 195 (1995).

Thus, in light of the totality of the circumstances in the instant case and, in particular, the short distance between the location of the stop and the crime scene, the short period of time between the stop and the officers' reception of the second dispatch, the time of the stop, and the allegations of conduct that was clearly criminal, we hold that there was reasonable suspicion to support the investigative stop.

## Conclusion

For the reasons stated in this opinion, we hold that the district court did not err in denying the motion to suppress and accordingly affirm the district court's judgment.

-18-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.