# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1806

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Donte Devell Dupree, also known as | * | |
| Lonnie Devell Lenow, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: October 19, 1999

Filed: January 28, 2000

_____

Before WOLLMAN, Chief Judge, HEANEY and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

Charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), Donte Devell Dupree moved to suppress the firearm, which was discovered in his duffel bag during an investigative stop. When the district court[1] denied that motion, Dupree entered a conditional plea of guilty and was sentenced to

_____

[1]The HONORABLE ANN D. MONTGOMERY, United States District Judge for the District of Minnesota, who adopted the Report and Recommendation of United States Magistrate Judge ARTHUR J. BOYLAN.

a mandatory minimum fifteen-year prison term. See 18 U.S.C. § 924(e)(1). He now appeals, arguing that the officers stopped him without reasonable suspicion and searched his duffel without his valid consent. We affirm.

At approximately 11:45 a.m. on August 15, 1998, Minneapolis police received an anonymous 911 call reporting that six or seven African-American men in their early to late twenties were selling drugs in an alley that runs parallel to Bloomington and Sixteenth Avenues between Lake and Twenty Ninth Streets. The caller said a large man with a cell phone wearing a white t-shirt and dark pants was the possible "main man." The tip was immediately dispatched to patrol officers on the mobile data computer terminals in their patrol cars. Officers Radke and Petocnik were on patrol, driving eastbound on Twenty Ninth Street approaching Bloomington Avenue. Being very near the reported drug trafficking, they responded to the dispatch.

Radke and Petocnik arrived at the intersection of Twenty Ninth Street and Bloomington Avenue, some three hundred feet from the entrance to the alley, about thirty seconds after receiving the dispatch. They saw a group of five African-American men standing in the intersection. Upon seeing the squad car, two of the men headed south along Bloomington Avenue toward Lake Street, while the other three, including a stocky man in a white t-shirt and blue jeans, began walking in the opposite direction. The officers followed the group of three because it included the one man who appeared to fit the caller's description of the "main man." They pulled alongside the trio and stopped on a bridge just north of Twenty Ninth Street. As the officers exited their patrol car and asked if they could talk to the men, Officer Radke observed one of the three, later identified as Mallet, walk over to the side of the bridge and drop a small object over the railing. Based on the nature of the tip, Officer Radke suspected an attempt to destroy evidence of drug trafficking. He moved quickly to restrain Mallet and the man standing next to him, later identified as Williams, from throwing more evidence off the fifty-foot-high bridge.

After seizing Mallet and Williams, Officer Radke instructed them to walk to the patrol car and put their hands on top of the car. Meanwhile, Officer Petocnik brought the third man, Dupree, to the patrol car and told him to place his hands on the car. As he did so, Dupree placed a duffel bag he was carrying on the hood of the car. While Officer Petocnik stood watch, Officer Radke frisked Mallet and Williams and placed them in the back of the patrol car to protect the safety of the outnumbered officers. Radke next conducted a pat-down search of Dupree. During that search, Officer Petocnik asked Dupree if the blue duffel bag was his. Dupree said yes. Petocnik then asked whether there was "anything in the bag he should know about." When Dupree replied no, Petocnik asked for permission to look inside the duffel. Both officers testified that Dupree consented before the duffel was searched. When a handgun was found in the duffel, the officers arrested Dupree for possession of the weapon. Mallet and Williams were identified and released.

Officers Radke and Petocnik and defendant Dupree testified at the pretrial suppression hearing. Adopting the Magistrate Judge's report and recommendation, the district court denied Dupree's motion to suppress, concluding there was reasonable suspicion to stop Dupree and his companions, and finding that Dupree voluntarily consented before the search of his duffel. On appeal, Dupree argues, as he did in the district court, that the investigative stop violated his Fourth Amendment rights and that he did not voluntarily consent to the search of his duffel.

**The <u>Terry</u> Stop.**

An investigative stop does not violate the Fourth Amendment if the police have reasonable suspicion "that the person stopped is, or is about to be, engaged in criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981); <u>see</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). Reasonable suspicion means "a particularized and objective basis for suspecting the person stopped of criminal activity." <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996) (quotation omitted). We review the district court's determination of

reasonable suspicion *de novo*. However, we review the court's findings of historical fact for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id. at 699.

Dupree argues that Officers Radke and Petocnik lacked reasonable suspicion because they stopped the three men solely on the basis of an anonymous tip that a bigger group of African-American men was selling drugs in an alley that the officers never even entered. Dupree further emphasizes that, while the tipster said the "main man" was large and carried a cell phone, Dupree is only five-feet-nine-inches tall and was not carrying a cell phone. Relying on the Supreme Court's decision in Alabama v. White, 496 U.S. 325, 328-32 (1990), Dupree contends that the anonymous tip had a low degree of reliability and therefore required substantially more corroboration than Officers Radke and Petocnik undertook before it could justify an investigative stop of Dupree and his companions.

We reject this contention because it fails to take into account all the relevant circumstances. Immediately after the anonymous tip was dispatched, Officers Radke and Petocnik arrived in the area and saw five men near the alley where the tipster said a somewhat bigger group had been selling drugs. As the officers approached, the group split up. The officers stopped alongside the threesome that included one man dressed like the tipster's "main man" and asked if they could talk. No Fourth Amendment interest is violated when police officers "approach[] an individual on the street" and "ask[] him if he is willing to answer some questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). Thus, the only actions the officers took solely on the basis of the anonymous tip did not violate Dupree's Fourth Amendment rights.

As he approached the group to talk, Officer Radke saw Mallet move quickly to the railing and drop a small object from the bridge to the railroad tracks far below. Based on the tip and his personal knowledge of frequent drug trafficking in that area, Radke reasonably suspected that Mallet was attempting to destroy evidence before

-4-

talking to the police. Only then did Radke seize Mallet and Williams and begin the investigative stop. Even more than the "headlong flight" that justified a <u>Terry</u> stop in <u>Illinois v. Wardlow</u>, No. 98-1036, 2000 WL 16315 (U.S. Jan. 12, 2000), Mallet's evasive action in dropping a small object off the bridge before talking to the police gave Officer Radke reasonable suspicion that criminal activity was afoot, as the anonymous tipster had reported.

In response, Dupree argues that Mallet's conduct did not give the officers reason to stop Dupree. We disagree. The suspects appeared to be traveling in a group. They had split off from a bigger group near the alley where the tipster reported a group was selling drugs. Dupree resembled the tipster's "main man." To paraphrase <u>Terry</u>, "it would have been poor police work indeed" if the officers had not included Dupree in their investigative stop. 392 U.S. at 23. In these circumstances, we agree with the district court that the investigative stop was based upon constitutionally reasonable suspicion and therefore did not violate Dupree's Fourth Amendment rights.

### The Search of the Duffel.

Dupree next contends that, even if the investigative stop was valid, Officer Petocnik unlawfully searched Dupree's duffel without consent. At the suppression hearing, both officers testified that Dupree consented; Dupree testified that consent was neither asked nor given. The district court credited the officers' testimony, a finding that is "virtually unreviewable on appeal." <u>United States v. Gleason</u>, 25 F.3d 605, 607 (8th Cir.) (quotation omitted), <u>cert. denied</u>, 513 U.S. 911 (1994). We have reviewed the suppression hearing transcript and conclude that the finding of consent is not clearly erroneous.

Finally, Dupree argues that, if he did consent to a search of his duffel, the consent was the involuntary product of duress and coercion. The district court found the consent voluntary. We review that finding for clear error. <u>See</u> <u>United States v.</u>

Galvan-Muro, 141 F.3d 904, 907 (8th Cir. 1998). "Voluntariness is a question of fact to be determined from all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 249 (1973); see generally United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990) (listing factors relevant to voluntariness analysis).

In this case, Dupree testified that consent was neither sought nor given, so of course he did not testify that his consent was coerced. Officer Petocnik simply asked whether he could look inside the duffel during an investigative stop on a public street. No threat, intimidation, or physical force accompanied the request, other than that inherent in an investigative stop and protective frisk. The officers did not mislead Dupree into thinking they had a right to search, as the narcotics officers did in United States v. Pena-Saiz, 161 F.3d 1175 (8th Cir. 1998). The district court found that he "was calm and cooperative during the encounter with the officers, answering their questions without hesitation or difficulty." If Dupree consented because he believed a search of his duffel was inevitable, that does not render the consent constitutionally involuntary. See United States v. Hatchcock, 103 F.3d 715, 720 (8th Cir.), cert. denied 521 U.S. 1127 (1997). Any other rule "would permit the criminal to defeat his prosecution by voluntarily revealing all of the evidence against him and then contending that he acted only in response to an implied assertion of unlawful authority." Schneckloth, 412 U.S. at 230-31 (quotation omitted). The district court's finding that Dupree voluntarily consented to the search of his duffel is not clearly erroneous.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-6-