# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2364
_____

Larenzo Irvin

*Plaintiff - Appellant*

v.

Tyler Richardson, et al.

*Defendants - Appellees*

_____

No. 19-2610
_____

Derrick Jerome Bates

*Plaintiff - Appellant*

v.

Tyler Richardson, et al.

*Defendants - Appellees*

_____

Appeals from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: June 15, 2021
Filed: December 16, 2021

_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.

_____

LOKEN, Circuit Judge.

In these § 1983 actions, Larenzo Irvin and Derrick Jerome Bates sued Cedar Rapids Police Officers Tyler Richardson and Jared Jupin, Police Chief Wayne Jerman, and the City of Cedar Rapids, asserting violations of their Fourth Amendment rights and claims under Iowa law when Officers Richardson and Jupin stopped Irvin and Bates while responding to a 911 call. Irvin and Bates appeal the grant of summary judgment dismissing all claims in each case. We consolidated the appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm the district court's grant of summary judgment dismissing Irvin's claims. We also affirm the dismissal of Bates's parallel state and federal claims, but we reverse the grant of summary judgment dismissing his federal and state law claims of false arrest after the initial encounter.

## I. Background

At 3:21 p.m. on April 24, 2016, a Cedar Rapids police dispatcher issued an alert for "a disturbance with a weapon" at "Higley Avenue and Wellington Street" based on a 911 call from a complainant named Elaine. It is undisputed that the dispatch transmitted to officers reported, "Complainant stated that there are three black males they live at the corner house by the alley. They are outside arguing, one displayed a 10-32 [gun] that subject is a black male white t-shirt heavier set. Another black male is in all blue." There was no description of the third individual, nor did the dispatcher provide the complainant's name or address.

Officer Richardson responded, arriving at the scene minutes later. Driving on Higley Avenue towards the intersection of Higley and Wellington, he saw a black

man enter a corner house, called out to him, but the man did not respond. Officer Richardson then saw a woman flagging him down and stopped to speak with her. The woman was the 911 caller, but that was not confirmed until after the officers' encounter with Irvin and Bates. In a ten-second exchange, the woman told Richardson that someone had gone around the corner wearing "white and black pants." Richardson asked, "white shirt, black pants?" and she responded, "er, white and blue." Officer Richardson then drove to the intersection and turned right onto Wellington. He saw two people -- later identified as Bates and Irvin -- walking away from him along the left side of the street. The dashcam video shows Bates wearing a red shirt and black pants and Irvin wearing a blue shirt and blue pants.[1]

Officer Richardson got out of his car and yelled, "Stop. Stop." Irvin and Bates turned their heads, then stopped. Richardson said, "Yeah, you guys." Bates replied, "No, we didn't do nothing." Richardson yelled, "Stop right now! Stop!" and drew his gun, pointed it at Irvin and Bates, and ordered them to get on the ground. Officer Jupin, whose squad car had arrived from the opposite direction, drew his gun and did the same. Irvin and Bates slowly got down on their knees. Richardson yelled, "Face down!" Richardson handcuffed Irvin. Jupin handcuffed Bates. A pat-down determined that neither was armed.

Handcuffed and seated on the ground, 16-year-old Irvin remained quiet. Bates, 33 years old, became agitated, speaking loudly and expressing anger that the officers had pulled their guns on him. Jupin stayed with Irvin and Bates while Richardson went a block away and talked to a heavyset black man in a white t-shirt the officers spotted while detaining Irvin and Bates. Richardson ordered the man to stop and put his hands on a stone wall next to the sidewalk. The man complied. Richardson patted him down for weapons, found none, and soon released him.

---

[1]The summary judgment record includes approximately 20-minute dashcam visual and audio footage from the squad cars of both Richardson and Jupin that confirm many of these facts.

Other officers arrived, giving Officer Jupin an opportunity to interview a bystander who witnessed the earlier disturbance. The witness said neither Bates nor Irvin was involved. Jupin returned to Irvin and Bates, who had been handcuffed for approximately 12 minutes, uncuffed them, and told them they were free to go. Irvin and Bates remained at the scene. Fifteen minutes later, Richardson arrested Bates for interference with official acts in violation of Iowa Code § 719.1(1).

Irvin and Bates filed administrative complaints with the Cedar Rapids Police Department, which ruled them unfounded, and these § 1983 actions. In addition to state-law claims for false arrest, Irvin and Bates asserted multiple Fourth Amendment violations: the officers lacked reasonable suspicion for an investigative Terry stop; the stop became an arrest without probable cause; Bates was later arrested without probable cause; and Chief Jerman and the City of Cedar Rapids failed to properly train the officers and ratified their unconstitutional conduct. The district court granted summary judgment dismissing all claims concluding, *inter alia*, that the officers did not violate plaintiffs' Fourth Amendment rights and therefore they are entitled to qualified immunity. These consolidated appeals followed.

"We review *de novo* the district court's grant of summary judgment based on qualified immunity." Robbins v. City of Des Moines, 984 F.3d 673, 677-78 (8th Cir. 2021), quoting Duffie v. City of Lincoln, 834 F.3d 877, 881 (8th Cir. 2016). We view the evidence in the light most favorable to Irvin and Bates, giving them the benefit of all reasonable inferences. Edwards v. Byrd, 750 F.3d 728, 731 (8th Cir. 2014). "Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir.) (en banc) (cleaned up), cert. denied, 565 U.S. 978 (2011).

Qualified immunity shields government officials from civil damage liability for a discretionary act that "does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit, not merely a defense to liability. The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quotation omitted). To avoid pretrial dismissal, a plaintiff must present facts showing the violation of a constitutional right that was clearly established at the time of the defendant's act. Id. at 232-33, 236.

## II. Discussion

**A. The Investigative Stop of Irvin and Bates.** A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000), citing Terry v. Ohio, 392 U.S. 1, 30 (1968). In conducting a Terry stop, the officer may make a protective pat-down search if the officer "has a reasonable, articulable suspicion that the person may be armed and presently dangerous." United States v. Davison, 808 F.3d 325, 329 (8th Cir. 2015) (citations omitted). Reasonable suspicion is a fact-specific inquiry, determined by the totality of the circumstances, taking account of an officer's deductions and rational inferences resulting from relevant training and experience. United States v. Arvizu, 534 U.S. 266, 273-74 (2002). It requires "some minimal level of objective justification," but a series of acts may be "innocent if viewed separately, but . . . taken together warrant [ ] further investigation." United States v. Sokolow, 490 U.S. 1, 7, 9-10 (1989) (cleaned up). We review the determination of reasonable suspicion *de novo*, "tak[ing] care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996).

When the issue is whether a § 1983 defendant police officer violated a *clearly established* Fourth Amendment right, if we determine that the officer lacked reasonable suspicion and thus conducted an unlawful Terry stop, he "may nonetheless

be entitled to qualified immunity if [he] had *arguable* reasonable suspicion -- that is, if a reasonable officer in the same position could have believed [he] had reasonable suspicion." Waters v. Madson, 921 F.3d 725, 736 (8th Cir. 2019); see Watson v. Boyd, 2 F.4th 1106, 1113-14 (8th Cir. 2021) (vacating and remanding the denial of qualified immunity); Robbins, 984 F.3d at 679.

The district court concluded that Officer Richardson had reasonable suspicion to stop and detain Irvin and Bates to determine whether they were involved in an unlawful firearm display during a public disturbance minutes earlier at a location they were walking away from. "Considering that [Bates] and Irvin were found in the vicinity to which Officer Richardson was dispatched and directed, that Irvin's clothing reasonably matched the description Officer Richardson had of one of the three males, and that [Bates] could have been the third male for whom no description was provided, the Court finds that Officer Richardson could reasonably believe that [Bates] and Irvin were involved in the incident that Officer Richardson was dispatched to investigate." This reasoning is consistent with numerous Eighth Circuit decisions concluding that "a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." United States v. Quinn, 812 F.3d 694, 698 (8th Cir. 2016); see Pollreis v. Marzolf, 9 F.4th 737, 744-45 (8th Cir. Aug. 16, 2021); United States v. Dupree, 202 F.3d 1046, 1047-49 (8th Cir. 2000); United States v. Juvenile TK, 134 F.3d 899, 903 (8th Cir. 1998).

In contending the district court erred in concluding the officers had reasonable suspicion, Irvin and Bates argue that neither man matched the description Officer Richardson received from dispatch or the description provided by the woman on the street of the person suspected of criminal activity -- the "heavier set" black male in a white t-shirt who "displayed a 10-32 [gun]" during a reported street disturbance. We reject this contention. First, while the investigating officers' primary focus was understandably the gun, the reported disturbance potentially involved violations of numerous Iowa criminal offenses -- disturbing the peace, Iowa Code § 723.4 (2)

-6-

(2010); using dangerous weapon, § 724.4(1) (1998); assault while displaying a dangerous weapon, § 708.1(c) (2013); and going armed with intent, § 708.8 (1978). It is well established that, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion." United States v. Hensley, 469 U.S. 221, 229 (1985). Thus, Irvin and Bates could be stopped if there was reasonable suspicion that either or both were *any* of the three men involved in the reported disturbance.

Second, even limiting our focus to more serious gun offenses, Officer Richardson had descriptions of two of the three men. Irvin arguably fit one of the descriptions; Bates did not but the third participant had not been described. Defendants' Statement of Undisputed Material Facts in Support of [their] Motion for Summary Judgment included, citing Jupin and Richardson affidavits:

> 12. As police officers, when Jupin and Richardson respond to a disturbance in which one person is reported as having a firearm, they bear in mind the possibility that others involved may also have a firearm.

Irvin and Bates both admitted this statement, so it is not an issue on appeal. Thus, the fact that neither Irvin nor Bates matched the description of the man who displayed a gun during the disturbance is not of critical importance.

The information that Officer Richardson received from the woman on the street sufficiently corroborated the dispatch he was investigating because she (1) was within a couple blocks of the reported disturbance; (2) flagged Officer Richardson down, indicating she was looking for or expecting police to arrive; (3) described a similar disturbance and (4) provided a description of one suspect similar to the dispatch report. Moments later, Richardson observed Irvin and Bates walking in the direction the woman indicated. Irvin's clothing matched the description of one suspect from

the dispatch report and the vague description the woman provided. We must consider the information Richardson received and his observations as a whole, rather than as discrete, disconnected occurrences. See, e.g., Waters, 921 F.3d at 736. We agree with the district court that the officers had reasonable suspicion -- at a minimum arguable reasonable suspicion -- and therefore are entitled to qualified immunity. See Dupree, 202 F.3d at 1049.

**B. Did the Terry Stop Become an Arrest Without Probable Cause?** A lawful Terry stop "may become an arrest, requiring probable cause, 'if the stop lasts for an unreasonably long time or if officers use unreasonable force.'" United States v. Newell, 596 F.3d 876, 879 (8th Cir.), cert. denied, 562 U.S. 864 (2010). Irvin and Bates argue that, even if the stop was lawful, Officers Richardson and Jupin turned the Terry stop into an unlawful arrest when they used unreasonable force by pointing their guns at Irvin and Bates and handcuffing them. When the officers stopped Irvin and Bates, "they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." Hensley, 469 U.S. at 235.

"It is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons . . . ." United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004). Likewise, police officers may reasonably handcuff a suspect in the course of a Terry stop to protect officer safety and maintain the status quo. United States v. Smith, 645 F.3d 998, 1002 (8th Cir. 2011) (collecting cases).

Here, the officers were investigating a disturbance involving a handgun. Although neither officer observed Bates or Irvin with a gun, they "lacked the personal knowledge to rule out [Irvin and Bates] as suspects." Pollreis, 9 F.4th at 748. Nor did the officers "point a gun at a compliant suspect for an unreasonably long period of time after [they had] taken control of the situation." Id. at 747. Though Irvin and Bates acknowledged Officer Richardson's initial command to "Stop," they continued

walking away despite repeated commands to stop. They finally stopped but did not immediately comply with a command to "Get on the ground now." Their actions did not negate the risk that one or both might be armed and dangerous. In response to this refusal to cooperate with a lawful directive to stop and to answer reasonable questions, Officer Richardson and then Officer Jupin drew their guns, pointed them in Irvin and Bates's direction, and then handcuffed the two when they finally lay on the ground. Although Irvin acted calmly throughout the stop, Bates was agitated and argumentative. In these circumstances, the force used by the officers did not turn the lawful Terry stop into an arrest. See Smith, 645 F.3d at 1002-03; Fisher, 364 F.3d at 973-74; United States v. Raino, 980 F.2d 1148, 1149-50 (8th Cir. 1992), cert. denied, 507 U.S. 1011 (1993).

Irvin and Bates further argue that the officers turned the Terry stop into an arrest by extending the detention for an unreasonably long time. We disagree. In assessing this issue, the Supreme Court "examine[s] whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspects]." United States v. Sharpe, 470 U.S. 675, 686 (1985). "[A] suspect's actions may contribute to the added delay about which he complains." Id. at 688. "There is no bright line rule." United States v. Morgan, 729 F.3d 1086, 1090 (8th Cir. 2013).

Here, Officers Richardson and Jupin actively investigated the disturbance after detaining Irvin and Bates, delayed by their refusal to cooperate. When backup arrived, Richardson interviewed a cooperative third individual and searched the area for a weapon. Jupin contacted a witness, who said that Irvin and Bates were not involved in the reported disturbance. Jupin promptly removed the handcuffs and told Irvin and Bates they were free to go, ending their detention. The entire encounter lasted approximately 13 minutes. We agree with the district court that Irvin and Bates "were detained no longer than was necessary for the officers to pursue their investigation" and therefore the lawful Terry stop "did not evolve into an arrest." The circumstances here are readily distinguishable from the handcuffing and extended

-9-

detention in our recent, divided panel opinion in <u>Haynes v. Minnehan</u>, No. 20-1777 (8th Cir. Sep. 21, 2021).

For these reasons, we affirm the district court's grant of qualified immunity dismissing these Fourth Amendment claims.

**C. The Separate Arrest of Bates.** Irvin and Bates asserted § 1983 and pendent state law claims that they were falsely arrested without probable cause prior to the end of their <u>Terry</u> stop detention. Our conclusion they were not arrested defeats those claims. Bates also asserted state and federal law claims that Officer Richardson arrested him several minutes after the detention ended, without probable cause that he had "interfere[d] with official acts" in violation of Iowa Code § 719.1 (2014).[2] We will address the state law claim first.

**1.** Section 719.1(1)(a) of the Iowa Code penalizes a person who "knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer." "The terms 'resist' and 'obstruct' . . . do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically." <u>Id.</u> § 719.1(3).

The district court concluded that Officer Richardson had probable cause to arrest Bates for interference with official acts:

> Even if the initial words, "stop, stop," are viewed as a request, when [Bates] . . . continued to walk away, Officer Richardson subsequently yelled, "Stop, right now! Stop!" [Bates] . . . continued to take a few

---

[2]Bates asserted this claim against Officer Jupin as well but his concession during the summary judgment proceedings that "Jupin did not participate in forming probable cause to arrest anyone, nor did he participate in the decision to arrest," defeats this claim even if he preserved it for appeal.

-10-

more steps and also hesitated to get to the ground as [he was] repeatedly ordered to do. Under these circumstances, it was reasonable for Officer Richardson to conclude that [Bates was] interfering with Officer Richardson's official acts.

The court cited State v. Sullivan, No. 08-0541, 2009 WL 250287, at *2 (Iowa App. Feb. 4, 2009), for the proposition that a defendant "need not use force to be guilty of Interference with Official Acts." The court acknowledged that the Supreme Court of Iowa held in State v. Lewis, 675 N.W.2d 516, 526 (Iowa 2004), that "[t]he mere act of quickly walking away from the officer and ignoring his directions to stop under these circumstances is not interference with official acts." In an earlier case, the Supreme Court of Iowa reversed a § 719.1(1) conviction because the indictment only alleged that defendant violated the statute "by not turning down the music at the officer's request," which did not satisfy the "resist" or "obstruct" element of § 719.1(1). State v. Smithson, 594 N.W.2d 1, 2-3 (Iowa 1999); see McCabe v. Maccaulay, 551 F. Supp. 2d 771, 794 (N.D. Iowa 2007) (under Smithson, "even passively 'failing to cooperate' with law enforcement officers does not provide arguable probable cause under [§ 719.1(1)]").

Given these controlling Supreme Court of Iowa authorities, we conclude the district court erred in granting summary judgment dismissing this state law claim. The Iowa Court of Appeals concluded in Sullivan that "Smithson and Lewis stand for the proposition that a single instance of mere failure to cooperate cannot serve as the basis for a charge of interference with official acts." 2009 WL 250287, at *4. Though not controlling precedent, that provides guidance here. The relevant facts are simply too uncertain and contested to conclude, as a matter of law, that Officer Richardson had probable cause to arrest Bates for "knowingly resist[ing] or obstruct[ing]" Richardson in the performance of his official duties. On appeal, defendants argue that Richardson is immune from liability under Iowa statutory immunities for so-called discretionary functions, Iowa Code § 670.4(1)(c), and for emergency responses, § 670.4(1)(k). The district court did not consider these issues,

and we decline to do so in the first instance. If properly preserved, the district court can take them up on remand.

**2.** Turning to Bates's § 1983 false arrest claim, in Small v. McCrystal, we affirmed the denial of qualified immunity to an Iowa police officer who made a § 719.1(1) arrest in similar circumstances because, *viewing the facts most favorably to plaintiff*, "he was walking away" from the officers and if he shouted an obscenity, "it was verbal harassment" within the meaning of § 719.1(3). 708 F.3d 997, 1004-05 (8th Cir. 2013). We conclude the same reasoning applies here. The relevant facts are too confused and contested to conclude, as a matter of law, that Officer Richardson is entitled to qualified immunity because he had arguable probable cause to believe that Bates's failure to cooperate with commands to stop and get to the ground, combined with speaking loudly and expressing anger at Richardson's actions, constituted interference with official acts in violation of § 719.1(1). Thus, the issue of qualified immunity must await further development at trial.

**D. The *Monell* Claims.** A municipality and policymakers such as Chief Jerman are subject to § 1983 liability if an "action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Mere employment of a tortfeasor does not provide a basis for liability. S.M. v. Lincoln County, 874 F.3d 581, 585 (8th Cir. 2017). "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee. Bolderson v. City of Wentzville, 840 F.3d 982, 985 (8th Cir. 2016) (citation omitted). Where the claim is that municipal action lawful on its face caused an employee to inflict constitutional injury, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 405 (1997).

The district court granted summary judgment dismissing the individual capacity claims against Chief Jerman and the official capacity claims against Jerman and the City because, absent a constitutional violation by the police officers, these defendants "cannot be held liable" for failure to train their officers. See, e.g., Sinclair v. City of Des Moines, 268 F.3d 594, 596-97 (8th Cir. 2001). We agree. What remains on appeal are the Monell claims based on Officer Richardson's arrest of Bates for violating Iowa Code § 719.1(1)(a), an alleged constitutional violation which has not yet been determined on the merits. Bates argues the district court erred in granting summary judgment dismissing these claims because whether Chief Jerman, exercising oversight authority, "reviewed the internal investigation of the officers' conduct, and specifically ratified the illegal conduct of Richardson" is a genuine issue of material fact for the jury. See generally Soltesz v. Rushmore Plaza Civic Ctr., 847 F.3d 941, 947 (8th Cir. 2017), applying City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). Defendants respond that Bates "cannot make the requisite showings to proceed on his theory of ratification because he cannot present any evidence the City failed to investigate or correct an officer's misconduct," citing Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999).

On the issue of ratification, the district court concluded, "[b]ecause neither Officer Richardson nor Officer Jupin committed any unlawful acts, Chief Jerman did not 'ratify' any unlawful actions by his alleged failure to adequately investigate the April 24, 2016 incident." This reasoning no longer applies to Bates's Monell claims based on his actual arrest. Even if Bates prevails on this false arrest claim against Officer Richardson, rigorous standards of culpability and causation will apply to whether Chief Jerman's after-the-fact determination was actionable ratification of a constitutional violation. See Waters, 921 F.3d at 743. But ratification issues are fact intensive. We decline to resolve these Monell issues as a matter of law on this summary judgment record and therefore include these issues in reversing the grant of summary judgment dismissing Bates's separate false arrest claims.

## III. Conclusion

In Irvin's appeal, No. 19-2364, we affirm the judgment of the district court. In Bates's appeal, No. 19-2610, we affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I concur in the reversal of summary judgment on Bates's claims related to his separate arrest, but I otherwise dissent.

Viewing the record in the light most favorable to Irvin and Bates, Officers Richardson and Jupin lacked reasonable suspicion to stop and detain them. The dispatcher relayed an anonymous 911 call, but did not provide any information indicating the basis of the caller's knowledge. The only corroboration identified is the information Officer Richardson received from the woman on the street. But at the time of the stop, Officer Richardson did not know the woman's name or even that she was the 911 caller. Moreover, the woman did not corroborate the dispatcher's report or report any criminal activity; she simply gave Officer Richardson a description of what a person who had just walked around the corner was wearing—wavering in her description and never mentioning a person in a red shirt—and said nothing more. In short, nothing the woman said to Officer Richardson linked the person she had just described to the conduct reported in the 911 call.

Even setting aside the reliability of the tip, neither Bates nor Irvin matched the description of the person who displayed the firearm—a heavyset man in a white t-shirt. See Navarette v. California, 572 U.S. 393, 401 (2014) ("Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968))). An objectively reasonable officer could see, in daylight, that Irvin was wearing a blue shirt and Bates a bright red one—and that neither could be described as "heavyset."

-14-

That Irvin and Bates may have matched the race and gender of the suspect and that they were in the same general location identified by the caller are not enough to raise a reasonable suspicion that either of them was the person who displayed a firearm. Cf. Bell v. Neukirch, 979 F.3d 594, 604–06 (8th Cir. 2020) (finding no probable cause where both the plaintiff and suspect were "black male juveniles wearing white t-shirts," but the plaintiff was taller and had different colored shorts and socks than the suspect).

Moreover, even if an officer could have reasonably believed that Irvin was the person described as wearing "all blue" and that Bates was the third, undescribed person, there was no reason to suspect that either of them was engaged in criminal activity. See United States v. Cortez, 449 U.S. 411, 418 (1981) ("[The] demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." (quoting Terry, 392 U.S. at 21 n.18)). The only suspicious activity the 911 caller described was that a heavyset man in a white t-shirt displayed a gun. There was no reason to believe any other person had a weapon, concealed or not, and a suspicion otherwise was nothing more than a hunch. While the 911 caller reported an argument where one man displayed a gun, she reported no threats, assaults, or shots fired. And when Officer Richardson turned the corner, the reported crime had ended, and neither Irvin nor Bates was behaving in a manner as to indicate they were armed or were engaged in—or about to engage in—criminal activity. Cf. Wilson v. Lamp, 901 F.3d 981, 987 (8th Cir. 2018) (explaining that "[c]ompanionship alone cannot justify a frisk" under Terry).[3]

---

[3]To the extent the officers argue that Irvin's and Bates's failure to comply with the first command to stop supplied a lawful basis to detain them, I disagree. "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). "And any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'" Id. (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)).

-15-

Viewing the facts in Irvin and Bates's favor, a reasonable jury could find that the officers lacked reasonable suspicion to stop and detain them.[4]

Applying the same standard, the <u>Terry</u> stop in this case—even if it was lawful initially—evolved into an arrest requiring probable cause. <u>Terry</u> stops are necessarily "limited in scope and manner." <u>United States v. Fisher</u>, 364 F.3d 970, 973 (8th Cir. 2004). As we have explained, "[a] <u>Terry</u> stop may become an arrest . . . 'if the stop lasts for an unreasonably long time or if officers use unreasonable force.'" <u>United States v. Newell</u>, 596 F.3d 876, 879 (8th Cir. 2010) (quoting <u>United States v. Navarrete–Barron</u>, 192 F.3d 786, 790 (8th Cir. 1999)). "Officers must use 'the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the <u>Terry</u> stop.'" <u>Id.</u> (quoting <u>Navarrete–Barron</u>, 192 F.3d at 790). We have thus said that "an action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." <u>United States v. Raino</u>, 980 F.2d 1148, 1149 (8th Cir. 1992) (cleaned up) (quoting <u>United States v. Rose</u>, 731 F.2d 1337, 1342 (8th Cir. 1984)). When determining whether an officer's conduct is reasonable in the context of the stop, we consider several factors. <u>Id.</u> at 1149–50 ("(1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective

---

[4]It may be that Officer Jupin was not involved in Officer Richardson's decision to detain Irvin and Bates, but the evidence—including an incident report written by Officer Jupin himself—shows that he reported to the scene in response to the dispatcher's call and drew his gun "due to the nature of the call" and the possibility that "a firearm may . . . be involved." When he arrived on the scene, he saw—as Officer Richardson did—one person in a red shirt and another in a blue one. He then drew his gun "more or less" at the same time as Officer Richardson did. Viewing the evidence in Bates and Irvin's favor, a jury could reasonably conclude that Officer Jupin participated in the stop based on his own independent assessment of the situation. <u>See</u> <u>Duffie v. City of Lincoln</u>, 834 F.3d 877, 884 (8th Cir. 2016) (reversing grant of qualified immunity to officers who assisted in effectuating stop where the evidence showed they unreasonably relied on the same information as the first officer on the scene).

-16-

suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.").

Here, the two officers were not outnumbered. Bates and Irvin were walking casually along the street at a normal to slow pace, and neither was acting nervously, erratically, or suspiciously; nor did they show signs of being armed. Viewing the evidence in the light most favorable to Bates and Irvin, they acknowledged Officer Richardson's initial command by saying they had not "done anything," indicating to the officer they were not the people he was looking for. And any initial hesitation to "get on the ground" must be viewed in their favor: that they misunderstood the situation, a conclusion a reasonable jury could reach after viewing the video of the stop. The reported criminal activity—displaying a gun in public—was not ongoing, so Officers Richardson and Jupin also did not need to take immediate action. Morever, while the two men were handcuffed, Bates heard the officers communicate by radio that they had seen someone matching the suspect's description and asked them: "The lady . . . just said it wasn't us. Why . . . is we still cuffed?" Yet Officers Richardson and Jupin continued to keep Irvin and Bates in handcuffs, prolonging the seizure until after the officers finished interviewing other individuals in the area. On these facts, there was nothing to suggest that the officers were in "serious danger," Fisher, 364 F.3d at 973, or that their safety was compromised.[5]

Because I would find that the officers lacked reasonable and articulable suspicion to detain Bates and Irvin, I would also conclude that they failed to meet the

---

[5]In concluding that the stop did not evolve into an arrest, the Court notes that the entire encounter lasted no more than thirteen minutes. However, "[a] Terry stop may turn into an arrest if the stop lasts for an unreasonably long time *or if officers use unreasonable force*." Navarrete-Barron, 192 F.3d at 790 (emphasis added) (citing Dunaway v. New York, 442 U.S. 200, 212 (1979)). Officers Richardson and Jupin drew their guns on Bates and Irvin almost immediately. A reasonable jury could conclude that no reasonable officer would view this situation as one that would immediately require the threat of deadly force.

more demanding standard of probable cause required for an arrest. See United States v. Guerrero, 374 F.3d 584, 590 (8th Cir. 2004) ("Facts which do not support a finding of reasonable suspicion . . . cannot support a finding of probable cause.").

III.

With the contours of these rights sufficiently clear[6] and viewing all of the facts in the light most favorable to Bates and Irvin, I believe that Officers Richardson and Jupin are not entitled to qualified immunity at this stage of the proceeding.[7]

————————————————

[6]The Court decides this case on the first prong of qualified immunity, so it does not reach the second prong of the analysis: whether the rights at issue were clearly established. I would find that they were. See, e.g., Cortez, 449 U.S. at 417–18 ("[T]he detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."); El–Ghazzawy v. Berthiaume, 636 F.3d 452, 460 (8th Cir. 2011) (concluding that it was clearly established in 2008 that "a reasonable officer could not have believed it was lawful to handcuff and frisk a suspect absent any concern for safety").

[7]Because the district court concluded that Bates's and Irvin's constitutional rights were not violated, it did not fully consider whether the City or Chief Jerman ratified any unconstitutional conduct. Accordingly, I would vacate the district court's judgment on ratification and remand for further consideration.